Case No. 23-2568

---

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

---

JANE DOE #1, a minor,
by her mother and next friend,
JANE DOE #2,

      Plaintiff-Appellee,

  v.

MUKWONAGO AREA SCHOOL DISTRICT,
and JOSEPH KOCH, in his official capacity as
Superintendent of Mukwonago Area School District,

      Defendants-Appellants.

.

---

Appeal from the United States District Court for the Eastern District of Wisconsin
Case No. 2:23-CV-876
The Honorable Judge Lynn Adelman

---

## APPELLATE BRIEF OF DEFENDANTS-APPELLANTS,
## MUKWONAGO AREA SCHOOL DISTRICT AND JOSEPH KOCH

---

Joel S. Aziere (*counsel of record*)
Corinne T. Duffy
**Buelow Vetter Buikema**
**Olson & Vliet, LLC**
20855 Watertown Road, Suite 200
Waukesha, WI 53186
Phone: (262) 364-0300
Facsimile: (262) 364-0320

*Attorneys for Defendants-*
*Appellants, Mukwonago Area*
*School District and Joseph Koch*

*ORAL ARGUMENT REQUESTED*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2568

Short Caption: Jane Doe #1 v. Mukwonago Area School District

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Defendants, Mukwonago Area School District and Joseph Koch, in his official capacity as District Superintendent

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Buelow Vetter Buikema Olson & Vliet, LLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Joel S. Aziere      Date: August 22, 2023

Attorney's Printed Name: Joel S. Aziere

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☑  No ☐

Address: 20855 Watertown Road, Suite 200

        Waukesha, WI 53186

Phone Number: (262) 364-0300      Fax Number: (262) 364-0320

E-Mail Address: jaziere@buelowvetter.com

rev. 12/19 AK

Save As      Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2568 _____

Short Caption: Jane Doe #1 v. Mukwonago Area School District _____

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   [ ]      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
      Defendants, Mukwonago Area School District and Joseph Koch, in his official capacity as District Superintendent _____

      _____

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
      Buelow Vetter Buikema Olson & Vliet, LLC _____

      _____

(3)      If the party, amicus or intervenor is a corporation:

      i)      Identify all its parent corporations, if any; and

            N/A _____

      ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

            N/A _____

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

      N/A _____

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

      N/A _____

Attorney's Signature: /s/ Corinne T. Duffy _____      Date: August 22, 2023 _____

Attorney's Printed Name:  Corinne T. Duffy _____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [ ]   No [✓]

Address:  20855 Watertown Road, Suite 200 _____

      Waukesha, WI 53186 _____

Phone Number: (262) 364-0300 _____      Fax Number:  (262) 364-0320 _____

E-Mail Address: cduffy@buelowvetter.com _____

rev. 12/19 AK

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES………………………………………………………… vi

PREFACE……………………………………………………………………………... 1

JURISDICTIONAL STATEMENT…………………………………………………... 4

STATEMENT OF THE ISSUES……………………………………………………... 5

STATEMENT OF THE CASE………………………………………………………... 5

    I.     Factual Background ………………………………………………………… 5

    II.    Procedural Background………………………………………………........ 9

SUMMARY OF THE ARGUMENT………………………………………………... 11

STANDARD OF REVIEW…………………………………………………………… 11

ARGUMENT…………………………………………………………………………. 12

    I.     THE DISTRICT COURT ABUSED ITS DISCRETION BY APPLYING THE LAW TO AN UNDEVELOPED—AND FACTUALLY DISTINGUISHABLE—RECORD……………….......  12

        A.    The District Court's Findings of Fact Are Unsupported by Evidence and Thus Clearly Erroneous……………………………………………………………… 13

        B.    The District Court Conflated This Case with Seventh Circuit Precedent and Thereby Abused its Discretion …………………………………………........... 14

    II.    THE DISTRICT COURT'S LEGAL CONCLUSIONS WERE BASED ENTIRELY ON *WHITAKER*, WHICH WAS WRONGLY DECIDED……………………………………………………… 17

        A.    *Whitaker* and *Martinsville* Create Logical and Legal Inconsistencies…………...................................................................... 19

        B.    *Whitaker* and *Martinsville* Obfuscate the Central Purpose Behind Title IX……………………………………………………………………………... 26

        C.    The Equal Protection Clause Permits the Provision of Sex-Segregated Restrooms…………………………………………………………………… 28

CONCLUSION……………………………………………………………………… 30

CERTIFICATE OF COMPLIANCE………………………………………………… 31

CERTIFICATE OF SERVICE…………………………………………………………………….. 32

SHORT APPENDIX………………………………………………………………………. 33

**TABLE OF AUTHORITIES**

**Cases**

*A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 764 (7th Cir. 2023)……………….. *passim*

*Adams v. Sch. Bd. of St. Johns Cty.*, 57 F.4th 791 (11th Cir. 2022)……………………... 18, 21, 29

*Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020)……………………………………………… *passim*

*Brannum v. Overton Cty. Sch. Bd.*, 516 F.3d 489 (6th Cir. 2005)……………………………….. 29

*Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979)……………………………………………… 26

*Chavez v. Credit Nation Auto Sales, LLC*,
    641 Fed. App'x 883 (11th Cir. 2016) (unpub.)………………………………………... 18

*Cooter v. Geil v. Hartmarx Corp.*, 496 U.S. 384 (1990)……………………………………… 15

*Doe v. Luzerne Cty.*, 660 F.3d 169 (3d Cir. 2011)……………………………………………… 29

*D.U. v. Rhoades*, 825 F.3d 331 (7th Cir. 2016)………………………………………………… 11

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of Am., Inc.*,
    549 F.3d 1079 (7th Cir. 2018)…………………………………………………………… 12

*Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011)……………………………………………… 18

*Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432 (7th Cir. 2005)…………… 15

*Hernandez v. Joliet Police Dep't*, 197 F.3d 256 (7th Cir. 1999)……………………………… 15

*In re Busson-Sokolik*, 635 F.3d 261 (7th Cir. 2011)………………………………………….. 14

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005)………………………………... 27

*J.A. v. Fort Wayne Cmty. Schs.*, No. 1:12 CV 155 JVB,
    2013 WL 4479229 (N.D. Ind. Aug. 20, 2013………………………………………… 29

*J.D.B. v. North Carolina*, 564 U.S. 261 (2011)………………………………………………… 29

*Lee v. Downs*, 641 F.2d 1117 (4th Cir. 1981)…………………………………………………… 29

*Machlett Labs., Inc. v. Techny Indus., Inc.*, 665 F.2d 795 (7th Cir. 1981)…………………… 23

*Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*,

128 F.3d 1111 (7th Cir. 1997)………………………………………………*passim*

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021)……………………………………… 28

*Neal v. Bd. of Trustees of Cal. State Univs.*, 198 F.3d 763 (9th Cir. 1999)……………………... 26

*Nordlinger v. Hahn*, 505 U.S. 1 (1992)…………………………………………………….. 28

*Platinum Home Mortgage Corp. v. Platinum Fin. Grp., Inc.*
149 F.3d 722 (7th Cir. 1998)………………………………………………………… 11, 12

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)…………………………………………... 28

*Rascon v. Hardimon*, 803 F.2d 269 (7th Cir. 1986)………………………………………… 5

*Rust Environment & Infrastructure, Inc. v. Teunissen*,
131 F.3d 1210 (7th Cir. 1997)……………………………………………………….. 13, 15

*Sepulveda v. Ramirez*, 967 F.2d 1413 (9th Cir. 1992)……………………………………… 29

*United States v. Baxter Healthcare Corp.*, 901 F.2d 1401 (7th Cir. 1990)………………… 11, 18

*United States v. Sparkman*, 973 F.3d 771 (7th Cir. 2020)………………………………….. 20

*United States v. United States Gypsum Co.*, 333 U.S. 364 (1948)……………………………. 13

*United States v. Virginia*, 518 U.S. 515 (1996)…………………………………………….. 28

*Wheeler v. Talbot*, 770 F.3d 550 (7th Cir. 2014)………………………………………… 12

*Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034 (7th Cir. 2017)……………………*passim*

*Wurm v. Valders Area Sch. Dist.*, No. 14-CV-1119,
2015 WL 2351487 (E.D. Wis. May 15, 2015)………………………………………… 5

## Constitutional Provisions and Federal Statutes

U.S. Const. amend. XIV, § 1…………………………………………………... *passim*

20 U.S.C. § 1681 (*Title IX of the Education Amendments of 1972*)……………………... *passim*

20 U.S.C. § 1686………………………………………………………………*passim*

28 U.S.C. § 1292……………………………………………………………… 4, 11

28 U.S.C. § 1331……………………………………………………………… 4, 11

28 U.S.C. § 1343……………………………………………………………………… 4, 11

42 U.S.C. § 1983……………………………………………………………………… 10

42 U.S.C. § 2000e-2 (*Title VII of the Civil Rights Act of 1964*)…………………………… *passim*

## Federal Rules and Regulations

Fed. R. Civ. P. 65……………………………………………………………………... 14

32 C.F.R. § 106.33…………………………………………………………………... 19, 20

32 C.F.R. § 106.37…………………………………………………………………... 4, 24, 27

34 C.F.R. § 106.41…………………………………………………………………… 4, 24

## Other Authorities

118 Cong. Rec. 5804-5808 (1972)……………………………………………………… 3, 19

Carolyn M. Mazure, *What Do We Mean By Sex and Gender?*, Yale Sch. Of Med., Sept. 19, 2021,
https://medicine.yale.edu/news-article/what-do-we-mean-by-sex-and-gender/…………. 21

*Fact Sheet on Gender and Health*, World Health Org.,
https://www.who.int/health-topics/gender#tab=tab_1...................................................... 22

Office of Research on Women's Health, *What Are Sex & Gender?*, Nat'l Inst. of Health,
https://orwh.od.nih.gov/sex-gender...................................................................................... 21

Psychiatry.org, *Definitions of Gender, Sex, and Sexual Orientation and Pronoun Usage*, Am.
Psychiatric Ass'n, https://www.psychiatry.org/psychiatrists/diversity/education/
transgender-and-gender-nonconforming-patients/definitions-and-pronoun-usage…….. 23

Sex and Gender Health Collaborative, *Defining Sex and Gender*, Am. Med. Women's Ass'n,
https://www.amwa-doc.org/sghc/defining-sex-and-gender/............................................. 22

*Sex*, Merriam-Webster Dictionary Online,
https://www.merriam-webster.com/dictionary/sex......................................................... 23

## PREFACE

In filing this appeal, the Mukwonago Area School District ("District" or "MASD") faces an exceptional challenge. The District was never afforded a hearing before the District Court granted Plaintiff-Appellee's motion for preliminary injunction. Thus, the District was never provided the opportunity to challenge Plaintiff-Appellee's assertions, to present testimony from the parents who withdrew their children from summer school after the District Court granted the preliminary injunction, or to present testimony of the parents who voiced privacy concerns over Jane Doe #1 ("Doe") sharing a bathroom with their female children. The District was not able to explain how students in the grade school use the bathrooms as changing facilities and is not able to cite any of that testimony in this brief. Despite these challenges, the District respectfully requests this Honorable Court consider the arguments set forth herein.

In *A.C. v. Metropolitan School District of Martinsville*, this Honorable Court declined the school districts' requests to revisit its holding in *Whitaker v. Kenosha Unified School District*, 75 F.4th 760, 764 (7th Cir. 2023). In so doing, this Honorable Court has placed school districts throughout its jurisdiction in the impossible position of applying a law intended to provide equal access to educational opportunities for young women in a wholly inconsistent and illogical manner. In the instant case, Doe is an 11-year-old student with male genitalia who identifies as female. The District Court has barred MASD from requiring Doe to share a bathroom with other 11-year-old students who also have male genitalia. In so doing, the District Court is requiring the 11-year-old females who attend the school to share a bathroom with a student who has male genitalia (i.e., Doe). The District Court claims the privacy rights of those 11-year-old girls are adequately protected by the stalls in the girls' bathroom. If that is the case, then why do the stalls

in the boys' bathroom not afford Doe sufficient privacy if Doe is required to use the boys' bathroom?

In the aforementioned cases, this Honorable Court incorporates Title IX into its analysis by looking solely to Title VII cases. The District Court did the same. The District Court has taken the position Doe (born with male genitalia and designated male at birth) is engaging in "gender nonconformity" by presenting as a girl and, as such, is protected under Title IX from the District's requirement that students use the restroom consistent with their biological sex. [Dkt. #15, p. 11]. This begs the question: what would the District Court do with an 11-year-old boy, who was born with male genitalia and presents as a boy, but who simply prefers the girls' bathroom? By preferring and using the girls' bathroom, rather than the boys' bathroom, this 11-year-old boy is engaging in "gender nonconformity." Must the District grant this 11-year-old boy access to the girls' bathroom on the basis of his gender nonconformance? Such a requirement would be absurd. But if that request were denied, one must ask: why is the 11-year-old biological male who presents as a male being denied the same opportunities as the 11-year-old biological male who presents as a female?

In *Martinsville*, this Honorable Court noted neither Title IX nor its implementing regulations define "sex." 75 F.4th at 770. This Court went on to assert "sex" has varying definitions. *Id*. Title IX reads, in relevant part, as follows:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a). If "sex" is not defined in the statute, and its meaning cannot be determined by the Court, then how could any entity ever be found guilty of excluding an individual on the basis thereof? Fortunately, the legislative intent of Title IX is well documented. When introducing Title IX to Congress, Senator Birch Bayh stated the following:

2

> We are all familiar with the stereotype [that] women [are] pretty things who go to college to find a husband, [and who] go on to graduate school because they want a more interesting husband, and finally marry, have children, and never work again. The desire of many schools not to waste a "man's place" on a woman stems from such stereotyped notions. But the facts contradict these myths about the "weaker sex," and it is time to change our operating assumptions. . . .
>
> While the impact of this amendment would be far-reaching, it is not a panacea. It is, however, an important first step in the effort to provide for the women of America something that is rightfully theirs—an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure the jobs of their choice with equal pay for equal work.

118 Cong. Rec. 5804-08 (1972).  While Title IX's application has been expanded since its introduction in 1971, its intent certainly remains the same: to provide women with equal access to educational opportunities.  By requiring MASD to allow Doe access to the girls' bathroom, the District Court is denying girls the equal access Title IX was intended to afford by placing Plaintiff-Appellee's interest above the privacy rights of all female students.

In *Martinsville*, this Honorable Court rejected the school districts' arguments *Whitaker* failed to account for Title IX's provisions permitting sex-segregated facilities and made it impossible to have truly sex-separated bathrooms.  75 F.4th at 770.  This Honorable Court noted the plaintiffs in *Martinsville* had no quarrel with the creation of sex-separated bathrooms.  *Id*. Instead, the question was who counts as a girl or a boy for purposes of using said bathrooms, and because the regulations do not define sex, nothing in these cases render section 1686 a nullity.  *Id*. But that is a distinction without a difference.  Sure, a school district could create separate restrooms based on sex.  But if there is no way to define "sex", then how can one enforce a policy to establish "sex-segregated facilities" pursuant to the statute?

If "sex" is a fluid, subjective state of mind (which it is not), the creation of "sex-segregated facilities" is truly rendered meaningless.  This Honorable Court has confused "sex" with "gender" and used the terms interchangeably.  But that interpretation of Title IX threatens to undermine all

3

the equities created by the statute, especially in the field of women's athletics. Under Title IX, an educational institution must provide "male" and "female" athletes with equal access to financial aid. This means that funds allocated to athletic scholarships must be proportional to the participation of "male" and "female" athletes. *See generally* 34 C.F.R. 106.41, 106.37(c). Under the Court's interpretation of "sex," an athletic program could only provide scholarships to male athletes and not run afoul of Title IX if half of them identified as female. Clearly such an absurdity would not pass judicial muster, but that is the slippery slope upon which the Court has placed us.

In *Martinsville*, this Honorable Court noted "at some point the Supreme Court will step in with more guidance than it has furnished so far." 75 F.4th at 764. This is likely true. However, in the meantime, the legal inconsistencies created by *Whitaker* and *Martinsville* warrant another look at the issues presented.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this matter as a civil action arising under the laws of the United States pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because the matter involves questions of federal statutes, specifically, Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, and its implementing regulations, as well as Constitutional provisions, specifically, the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

This appeal is taken from an interlocutory injunction order of the U.S. District Court for the Eastern District of Wisconsin, entered on July 11, 2023 by the Honorable Lynn Adelman (Case No. 2:23-cv-876). The United States Court of Appeals has jurisdiction to decide this case pursuant to 28 U.S.C. § 1292(a)(1), as this is an appeal of an interlocutory order of a district court of the United States.

4

Mukwonago Area School District ("District" or "MASD") and Joseph Koch,[1] Defendants-Appellants, by their attorneys, Buelow Vetter Buikema Olson & Vliet, filed the Notice of Appeal with the District Court on August 9, 2023; filed their Docketing Statement with the Seventh Circuit on August 10, 2023; and filed their Transcript Information Sheet with the Seventh Circuit on August 21, 2023. [Dkt. #24; App. Dkt. ##2, 7].

## STATEMENT OF THE ISSUES

1.     Whether, in failing to conduct a hearing on Plaintiff-Appellee's Motion for Preliminary Injunction, the District Court abused its discretion by applying the law to an undeveloped—and factually distinguishable—record.

2.     Whether a school district violates Title IX of the Education Amendments Act of 1972 and the Equal Protection Clause of the United States Constitution by directing students to use the bathroom corresponding with their sex assigned at birth pursuant to its Bathroom Use Policy, when such policy explicitly allows for exceptions to or accommodations for this requirement on a case-by-case basis, including, but not limited to access to gender-neutral bathrooms and faculty/staff supports.

## STATEMENT OF THE CASE

### I.     Factual Background

Jane Doe #1 ("Doe") is an 11-year-old transgender student at Prairie View Elementary School ("Prairie View"), a primary school within the District.  Although Doe was assigned male

---

[1] Because Plaintiff-Appellee redundantly sued the District and an employee in his official capacity for the same claims, the District is the proper and only party.  *See Rascon v. Hardimon*, 803 F.2d 269, 274 (7th Cir. 1986) (stating that, to the extent that the plaintiff sued an individual defendant in his official capacity, that "action operates as a claim against the government entity itself"); *Wurm v. Valders Area Sch. Dist.*, No. 14-CV-1119, 2015 WL 2351487 (E.D. Wis. May 15, 2015) (dismissing the plaintiff's claims against a defendant in her official capacity as redundant).  Defendants-Appellants raised this issue in their Answer and Affirmative Defenses, below, but also note it here for the Court.  [Dkt. #23, p. 11].

at birth, Doe identifies as a girl, using she/her pronouns and presenting as a girl in everyday life. [Dkt. #5-1, p. 3]. In the spring of 2023, the District began receiving phone calls and emails from parents regarding student restroom use. Specifically, several District parents and community members expressed concerns regarding Doe's use of the girls' bathroom despite having been assigned male at birth.

Following extensive discussion on the subject and consideration of the underlying (and competing) interests involved, the School Board on May 23, 2023 communicated to District parents and students that it would require students to use the locker rooms and bathrooms of their sex assigned at birth and would develop a School Board policy to this effect. [Dkt. #5-1, p. 6; Dkt. #5-3, p. 2]. That same day, former District Superintendent Shawn McNulty and Prairie View Principal Valerie Vos met with Doe's mother, Jane Doe #2, to discuss the School Board's decision and brainstorm how best to support Doe. At such meeting, former Superintendent McNulty and Principal Vos suggested a Section 504 evaluation as a possible next step, particularly given Doe's anticipated attendance in the Mukwonago High School summer school program.[2] On May 25, 2023, Director of Pupil Services Christine Bowden called Jane Doe #2 to discuss a comprehensive evaluation. Then, Ms. Bowden sent Jane Doe #2 the following email on May 30, 2023:

> [Jane Doe #2],
>
> Thank you for taking the time to talk with me last week (5-25-23). As discussed, based on [Jane Doe #1]'s diagnosis of ADHD and generalized anxiety disorder, state and federal laws regarding Child Find require the District to initiate a special education and/or Section 504 referral. A referral is the first step in the evaluation process to determine whether [Jane Doe #1] qualifies as a child with a disability under the IDEA and if so, whether [Jane Doe #1] requires specially designed instruction. We could also explore whether [Jane Doe #1] qualifies for additional support or services under Section 504. I understand you do not wish to pursue a referral nor consent to additional testing at this time, and you have that right to refuse consent.

---

[2] Although Doe attends Prairie View Elementary School, all summer school programs were conducted at Mukwonago High School.

With the summer approaching and the need to create a team, I would ask that for scheduling purposes, you return the consent for evaluation by June 2nd. This date is certainly flexible. Please contact me with any questions. I can be reached at 262.363.6300 ext. 24200.

Attached is the referral for an evaluation and a copy of your procedural safeguards.[3]

On June 1, 2023, the District sent Jane Doe #2 a Notice and Consent Regarding the Need to Conduct Additional Assessments, which included identifying the existing data to be reviewed along with the suggestion of behavior rating scales to determine eligibility.  Despite the aforementioned efforts, the District received no response from Jane Doe #2.  On June 16, 2023, Superintendent Koch sent Jane Doe #2 a letter to articulate the requirement that Doe use either a single-user, gender-neutral bathroom or the boys' restroom during summer school.  [Dkt. #5-1, p. 6; Dkt. #5-5, p. 3].  The same day, Jane Doe #2 emailed Ms. Bowden to confirm she had received hard copies of the Special Education and Section 504 referral forms in the mail, to reiterate the fact she did not give consent for said referrals, and to inquire into why such referrals were necessary.  On June 22, 2023, Ms. Bowden emailed Jane Doe #2 the following response:

Good Afternoon [Jane Doe #2],

Thank you for your email. I understand that you do not wish to pursue a referral for special education or a 504 and that is your right to refuse consent. I would like to frame out the rationale and reasoning behind the district's child find obligation and special education referral for [Doe].

ADHD – [Doe] currently has universal supports in place for managing her ADHD [sic] these include taking motor breaks during the school day and using fidgets as necessary. Although these are currently supported in the general education setting, an IEP or 504 solidifies these supports and ensures that [Doe] continues to be able to access them as she transitions from grade to grade and elementary to middle school. A referral for special education is not indicative of qualifying for special education services, it is a team approach to analyzing if [Doe] would benefit from any additional support. ADHD is a recognized area of impairment and is defined as such in the DSM-V.

---

[3] Importantly, this email does not appear in the evidentiary record below, namely because no fact finding took place preceding implementation of the preliminary injunction at issue. [Dkt. #9, p. 4].

Generalized Anxiety Disorder – [Doe] currently accesses the school counselor or school psychologist 2-3x per week. Although these are currently supported from a universal lens, an IEP or 504 solidifies these supports and ensures that [Jane Doe #1] continues to be able to access them as she transitions from grade to grade and elementary to middle school. Additionally, the school psychologist also checks in with the classroom teacher weekly to ensure that [Doe] is being successful in navigating her emotions.

Gender Dysphoria – Currently this diagnosis is recognized as a disorder in the DSM-V. This does not equate to [Doe] having a disability. However, as [Doe] navigates the emotions and social situations, it can have an impact that may require additional services such as coping strategies, more frequent check-ins, emotional regulation strategies as such examples. This may not require specially designed instruction. It does foster conversations around how to best support her.

As outlined in the Department's regulations implementing Section 504, school districts must conduct individualized evaluations of students who, because of disability, including ADHD, need or are believed to need special education or related services, and must ensure that qualified students with disabilities receive appropriate services that are based on specific needs, not cost, and not based on stereotypes or generalized misunderstanding of a disability. These and other Section 504 obligations apply to all students with disabilities and specifically pertain to students with ADHD.

Thank you,

Christine Bowden[4]

Again, the District received no response from Jane Doe #2 regarding additional supports for Doe. On June 19, 2023, Ms. Bowden again emailed Jane Doe #2, this time attaching a map of the high school to indicate the location of Doe's summer school classrooms and the single-user, gender-neutral bathrooms at her disposal. [Dkt. #5-1, pp. 6-7; Dkt. #5-6, pp. 2-4]. When Doe continued to use the girls' restroom despite the District's directives to the contrary, District personnel communicated this to Jane Doe #2 and reiterated the requirement that Doe use either a single-user, gender-neutral bathroom or the boys' restroom. [Dkt. #5-1, pp. 7-8; Dkt. #5-7, p. 2].

---

[4] *See* footnote 2, *supra*. [Dkt. #9, pp. 5-6].

8

In addition, District personnel met with Doe to communicate the District's expectations and offer additional support. [Dkt. #5-8, p. 2; Dkt. #5-11, p. 2].

On June 26, 2023, the District codified its student bathroom use policy as Policy 5514 – Student Privacy in Restrooms and Locker Rooms, pursuant to which students are directed to use the bathroom corresponding with their sex assigned at birth. Board Policy 5514 requires a team of District staff to consider exceptions or accommodations to this requirement on a case-by-case basis in consultation with the student, the student's parents, the Director of Student Services, the school psychologist, the school counselor, the classroom teacher, the building principal, and any other individuals the District deems appropriate. [Dkt. #5-16, p. 2].

Plaintiff-Appellee's legal counsel sent the District a demand letter on June 27, 2023, alleging the District's treatment of Doe constitutes impermissible discrimination based on sex and demanding that MASD both cease its purported discrimination and rescind its Board Policy 5514. [Dkt. #5-1, p. 8; Dkt. #5-13, pp. 2-9]. Contrary to Plaintiff-Appellee's contentions, the District did not refuse the demands articulated in the June 27 letter; in fact, the District's legal counsel indicated the direct opposite in their response letter of June 28, 2023:

> We are not summarily rejecting the items in your demand letter. However, the District would like to first engage with the family and carry out the processes outlined in its policy. Following a meeting with the family, we anticipate being able to respond to the demands in more certain terms at that time.

[Dkt. #5-14, p. 5; *but see* Dkt. #5-1, p. 8]. As illustrated in the following section, Plaintiff-Appellee refused to meet with the District to discuss and begin such process, instead initiating the underlying civil action.

## II.    Procedural Background

Rather than engage with the District in the accommodation procedure outlined within Board Policy 5514, Jane Doe #2 filed suit against the District and Superintendent Koch on June

9

30, 2023, alleging discrimination based on sex in violation of Title IX of the Education Amendments of 1972 and the Equal Protection Clause of the Fourteenth Amendment via 42 U.S.C. § 1983. [Dkt. #1]. In addition, Plaintiff-Appellee simultaneously filed a Motion for Temporary Restraining Order and Preliminary Injunction. [Dkt. #5]. Importantly, Plaintiff-Appellee submitted these filings in the late afternoon of Friday, June 30, 2023, preceding a four-day holiday weekend. Defendants-Appellants reacted expeditiously to present their opposition to the District Court through a brief submitted on July 4, 2023. [Dkt. #9]. Plaintiff-Appellee filed a reply brief in the evening of July 5th, and the District Court granted the requested TRO the following morning. [Dkt. ##13, 14]. Then, without conducting an evidentiary hearing to determine whether Plaintiff-Appellee was entitled to the injunctive relief requested, the District Court granted the Motion for Preliminary Injunction on July 11, 2023. [Dkt. ##15, 16]. Specifically, the District Court prohibited Defendants-Appellants from: (1) enforcing against Doe any policy, practice, or custom that denies Doe access to girls' restrooms at school and school-sponsored events; and (2) taking any formal or informal disciplinary action against Doe for using girls' restrooms at school and school-sponsored events. [*Id.*].

The Order granting the preliminary injunction was based upon the District Court's legal conclusions: (1) Doe was likely to succeed on the merits of her claims; (2) Doe would suffer irreparable harm in the absence of an injunction; and (3) the balance of harms and the public interest favor issuance of an injunction. [Dkt. #16]. However, the District Court made such legal conclusions without hearing testimony from either party—and therefore without receiving any evidence—on the purported irreparable harm and implicated public interest.

Defendants-Appellants timely appealed the District Court's interlocutory order granting Jane Doe #2's requested preliminary injunction to the United States Court of Appeals for the

Seventh Circuit on August 9, 2023 and pursuant to 28 U.S.C. §§ 1292(a)(1), 1331, and 1343(a)(3). [Dkt. #24].[5]  Defendants-Appellants now urge this Court to reverse the ruling of the lower court and thereby deny the extraordinary relief requested.

## SUMMARY OF THE ARGUMENT

In this case, the District Court granted the extraordinary injunctive relief Plaintiff-Appellee requested without having heard testimony, made credibility determinations, or allowed an opportunity for cross-examination.  The District Court based its decision on premature legal conclusions drawn from an undeveloped record, conflating the circumstances at bar with Seventh Circuit precedent despite not having evaluated evidence on the essential questions under review. Accordingly, the District Court abused its discretion by committing errors of fact and law, which Defendants-Appellants urge this Court to correct by reversing such decision and denying the preliminary injunction at issue.

## STANDARD OF REVIEW

In reviewing the grant of a preliminary injunction, an appellate court evaluates the lower court's "findings of fact for clear error, its balancing of factors for an abuse of discretion, and its legal conclusions *de novo*."  *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc*., 128 F.3d 1111, 1114 (7th Cir. 1997); s*ee also United States v. Baxter Healthcare Corp*., 901 F.2d 1401, 1407 (7th Cir. 1990); *Platinum Home Mortgage Corp. v. Platinum Fin. Grp., Inc*., 149 F.3d 722, 726 (7th Cir. 1998).

Importantly, a preliminary injunction is an extraordinary remedy never awarded as of right. *See D.U. v. Rhoades*, 825 F.3d 331, 335 (7th Cir. 2016).  When evaluating the merits of a motion for preliminary injunctive relief, a district court must determine whether the movant has

---

[5] Defendants-Appellants requested a stay of the lower proceedings pending appeal, which the District Court granted on August 30, 2023.  [Dkt. #33].

demonstrated: (1) the movant has a reasonable likelihood of success on the merits of the claims; (2) no adequate remedy at law exists; and (3) the movant will suffer irreparable harm if preliminary injunctive relief is denied.  *See Platinum Home Mortgage Corp.*, 149 F.3d at 726.

When an examination into the aforementioned factors reveals clear error in the lower court's factual findings, abuse of discretion regarding the balancing of such factors, and/or untenable legal conclusions based thereon, its decision must be reversed.  *See, e.g., Meridian Mut. Ins. Co.*, 128 F.3d at 1114.  In other words, "[a] district court abuses its discretion when, in conducting its preliminary injunction analysis, it commits a clear error of fact or an error of law." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2018).

## ARGUMENT

### I.    THE DISTRICT COURT ABUSED ITS DISCRETION BY APPLYING THE LAW TO AN UNDEVELOPED—AND FACTUALLY DISTINGUISHABLE—RECORD.

Importantly, the court must hear from the defendants and receive evidence on the issues raised before taking the "extraordinary step of awarding injunctive relief." *Wheeler v. Talbot*, 770 F.3d 550, 554 (7th Cir. 2014).  Here, however, the District Court's Order granting the preliminary injunction was based on legal conclusions made without hearing testimony on the purported irreparable harm and implicated public interest.  [Dkt. ##15, 16].

In its Order granting the preliminary injunction, the District Court relied extensively on *Whitaker v. Kenosha Unified School District*, which held, in pertinent part, as follows: Title IX and the Equal Protection Clause prevent discrimination against transgender students; "a policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance"; and "[p]roviding a gender-neutral alternative is not sufficient to relieve the School District from liability, as it is the policy itself

12

which violates [Title IX]." 858 F.3d 1034, 1049-1050 (7th Cir. 2017).[6] [Dkt. #15, p. 12]. Not only is this case factually distinguishable from *Whitaker*, but the District Court also conflated the cases without having even conducted fact finding. Accordingly, the District Court abused its discretion, and its judgment must therefore be reversed.

### A. The District Court's Findings of Fact Are Unsupported by Evidence and Thus Clearly Erroneous.

First, the lower court granted Plaintiff-Appellee's requested preliminary injunction without receiving evidence on the issues raised. Accordingly, the purported "findings of fact" upon which the District Court based its Order granting the requested relief are clearly erroneous.

As indicated above, an appellate court must reverse the grant of a preliminary injunction when the lower court's findings of fact are clearly erroneous. *See Meridian Mut. Ins. Co.*, 128 F.3d at 1114. A finding is "clearly erroneous" when although there may be some evidence to support it, the reviewing 'court is left with the definite and firm conviction that a mistake has been committed.'" *Rust Environment & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1216 (7th Cir. 1997) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). In other words, a finding that is unsupported by substantial, credible evidence is clearly erroneous. *See, e.g., Meridian Mut. Ins. Co.*, 128 F.3d at 1117.

In this case, the District Court heard no testimony, made no credibility determinations, and allowed no opportunity for cross-examination. Accordingly, the lower court had no "facts" against which to apply the law and thereby assess the likelihood of success to grant the preliminary injunction in the first place. In fact, Defendants-Appellants had not even been formally served

---

[6] Defendants-Appellants recognize the Seventh Circuit also recently ruled in favor of the student in a case involving similar legal issues. *See AC v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023). Not only is *Martinsville* distinguishable from the case at bar, however, but here the District Court also granted the preliminary injunction by applying the law to an incomplete factual record.

with a copy of the Summons and Complaint (though opposing counsel had sent a courtesy copy via email) when the District Court issued its preliminary injunction on July 11, 2023. [Dkt. ##15, 16, 19]. *See Wheeler*, 770 F.3d at 552 ("[A] court may not issue a preliminary injunction without advance notice to the adverse party, Fed. R. Civ. P. 65(a)(1), and [defendant] had not yet been served when the district court acted on [plaintiff's] motion."). Instead, the lower court's factual findings were based entirely on one-sided information derived from the Complaint and Motion for Temporary Restraining Order and Preliminary Injunction that Plaintiff-Appellee filed on June 30, 2023. [Dkt. ##1, 5, 15]. By way of example, the District Court cites material Plaintiff-Appellee submitted to support its "factual findings" eight times throughout the statement of facts in its July 11 Order; however, there are no references to evidence Defendants-Appellants presented because they were never given an opportunity to do so. [Dkt. #15, pp. 2-9]. As such, the lower court's findings are wholly unsupported by substantial, credible evidence in the record and are therefore clearly erroneous.

### B. The District Court Conflated This Case with Seventh Circuit Precedent and Thereby Abused its Discretion.

The District Court then erred by affording undue weight to disputed facts and conflating the undeveloped record with *Whitaker v. Kenosha Unified School District*, 858 F.3d 1034 (7th Cir. 2017). In so doing, the lower court not only acted prematurely, but also abused its discretionary powers.

While an appellate court reviews the district court's findings of fact for clear error, it assesses the balancing of such facts under an abuse of discretion standard. *See, e.g., Meridian Mut. Ins. Co*., 128 F.3d at 1114. An "abuse of discretion" occurs "when the court has acted contrary to the law or reached an unreasonable result." *In re Busson-Sokolik*, 635 F.3d 261, 269 (7th Cir. 2011) (internal citation omitted). Thus, a district court abuses its discretion "when it

bases its decision on the erroneous view of the law or an erroneous assessment of the evidence." *Hernandez v. Joliet Police Dep't*, 197 F.3d 256, 264 (7th Cir. 1999) (citing *Cooter v. Geil v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).  Here, the lower court applied Seventh Circuit precedent against an undeveloped record while conducting the balancing test and thereby abused its discretion.

As discussed in Section I(A), *supra*, the District Court granted the preliminary injunction without ever taking evidence on the purported irreparable harm and implicated public interest. [Dkt. ##15, 16].  Therefore, there were no established "facts" against which the District Court could apply the law and thereby assess the likelihood of success, which is the threshold consideration in any motion for preliminary injunction.  [App. Dkt. #1, pp. 3-5].  *See Rust Environment & Infrastructure, Inc. v. Teunissen*, 131 F.3d at 1213 (noting the threshold consideration in a motion for preliminary injunction is the movant's likelihood of success on the merits of her underlying claim); *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.") (internal citation omitted).  In this case, Plaintiff-Appellee did not carry her burden; she merely alleged facts in her Complaint and presented legal arguments in her initial Motion for Temporary Restraining Order and Preliminary Injunction.  [Dkt. ##1, 5].  Although Defendants-Appellants acted expeditiously to present their case despite having not even been served, they were unable to formally proffer evidence and thereby call Plaintiff-Appellee's factual assertions into question given the lower court's failure to conduct a hearing.  [Dkt. #9].

Nevertheless, the District Court purported to conduct the balancing test based entirely on Plaintiff-Appellee's contentions.  [Dkt. #15].  *See Machlett Labs., Inc. v. Techny Indus., Inc.*, 665

F.2d 795, 797 (7th Cir. 1981) ("[W]hen as in this case the district court merely adopts verbatim the findings and conclusions of the prevailing party 'they may therefore be more critically examined.'") (internal citation omitted).  Based on information gleaned from Plaintiff-Appellee's Complaint and Motion for Preliminary Injunction, alone, the District Court concluded "this case is not factually distinguishable from *Whitaker*"; Plaintiff-Appellee was likely to achieve success on the merits; Doe would suffer irreparable harm in the absence of an injunction; neither the school district nor the public would be harmed by Doe's continued use of the girls' bathroom; and the evidence consequently weighed in favor of granting an injunction.  [Dkt. #15, pp. 13-18].

However, without having received evidence on the issues, the aforementioned legal conclusions are baseless.  For example, the District Court cannot compare this case to *Whitaker* when, by its own admission, the "defendants have not submitted evidence" regarding the balancing test or even had the opportunity to do so.  [Dkt. #15, p. 18].  If they had, the record would reflect that unlike the school districts in *Whitaker* and *Martinsville*, the District had a policy in place for handling gender-affirming bathroom access for transgender students, and that Jane Doe #2 refused to participate in the process prescribed therein despite the District's many attempts to engage with her.  In addition, Defendants-Appellants would have addressed the fact Doe is an 11-year-old child, unlike the plaintiffs in *Whitaker* and *Martinsville*, which bears on the irreparable harm and public interest analyses.[7]  Likewise, the District Court would have heard testimony from District faculty and staff regarding the particulars of such bathroom policy, which expressly provides for student accommodations—another fact absent from *Whitaker* and *Martinsville*.  The District Court would have learned the bathrooms in the Elementary School are used as changing rooms by students—

---

[7] The plaintiff in *Whitaker* was a 17-year-old high school senior when the Seventh Circuit addressed his case; the plaintiffs in *Martinsville* were 13 and 15 years old, respectively, when their cases reached the Seventh Circuit.  858 F.3d at 1038; 75 F.4th at 764-766.

yet another fact absent from *Whitaker* and *Martinsville*. Finally, the Seventh Circuit in both *Whitaker* and *Martinsville* noted that students and their parents had not asserted specific and/or substantiated privacy concerns; in the case at bar, multiple parents disenrolled their children from the District's summer school program as a result of the lower court's preliminary injunction, and numerous individuals voiced specific concerns about and objections to Doe's bathroom use.

Then, there are additional factual distinctions never considered by the District Court:

- In *Martinsville*, A.C. was prescribed hormonal suppression drugs that block menstruation and was set to begin testosterone supplements. B.E. and S.E. had been taking testosterone for some time. In this case, Doe is not undergoing any of these treatments.

- In *Martinsville*, A.C. had to ask permission and sign into the health office each time to use the gender-neutral bathroom. In this case, Doe has no such requirements.

- In *Martinsville*, neither school district had a formal bathroom use policy. In this case, the District has a formal policy, with an established process for requesting and granting accommodation, in which Jane Doe #2 refused to engage.

- In *Whitaker*, A.W. had a medical condition requiring extensive water intake, requiring frequent trips to the bathroom. In *Martinsville*, both B.E. and S.E. had conditions that impede colon function and require them to take laxatives, which required frequent bathroom usage. In this case, Doe has no such condition.

Through its Order, the District Court addressed none of the aforementioned information— all of which would certainly have impacted the preliminary injunction balancing test. Ultimately, the lower court premised its decision on legal conclusions drawn from an undeveloped factual record and in so doing abused its discretion. As such, this Court must reverse.

## II.   THE DISTRICT COURT'S LEGAL CONCLUSIONS WERE BASED ENTIRELY ON *WHITAKER*, WHICH WAS WRONGLY DECIDED.[8]

---

[8] Importantly, the District Court did not base its erroneous findings on the Seventh Circuit's recent decision in *A.C. v. Metro. Sch. Dist. of Martinsville* because *Martinsville* was not decided until August 1st, whereas the District Court issued its Decision and Order in this case on July 11, 2023. [Dkt #15]. However, because *Martinsville* is now binding Seventh Circuit precedent, relied on *Whitaker*, and was likewise wrongly decided, this brief will also address that case.

The District Court erred not only by conflating this case with *Whitaker* without having heard evidence on the central legal issues, but also by relying entirely on Seventh Circuit precedent that was wrongly decided.

Whereas an appellate court defers to a district court's decision to grant a preliminary injunction insofar as that decision involves the discretionary acts of weighing evidence or balancing equitable factors," its "more purely legal conclusions . . . are subject to *de novo* review." *United States v. Baxter Healthcare Corp.*, 901 F.2d at 1407.

As indicated in Section I, *supra*, the District Court relied almost entirely on *Whitaker v. Kenosha Unified School District* in its Order and Decision. [Dkt. #15, p. 12]. *Whitaker* held, in pertinent part, the following: Title IX and the Equal Protection Clause prevent discrimination against transgender students; "a policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance"; and "[p]roviding a gender-neutral alternative is not sufficient to relieve the School District from liability, as it is the policy itself which violates [Title IX]." 858 F.3d 1034, 1049-1050 (7th Cir. 2017). Notably, the *Whitaker* Court found justification for its Title IX holding in Eleventh Circuit case law involving Title VII claims.[9] Since *Whitaker* was decided, however, the Eleventh Circuit has articulated the correct standard against which to judge Title IX claims involving analogous facts. *See Adams v. School Board of St. Johns Cty.*, 57 F.4th 791 (11th Cir. 2022). Moreover, the Seventh Circuit's legal reasoning in *Whitaker* (and *Martinsville*) is logically inconsistent and directly contravenes the legislative purpose behind and express language of Title IX and the Equal Protection Clause. Accordingly, the District Court assessed Plaintiff-Appellee's

---

[9] *See* 858 F.3d 1034, 1048 (citing *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011); *Chavez v. Credit Nation Auto Sales*, LLC, 641 Fed. App'x 883, 884 (11th Cir. 2016) (unpub.)).

Motion for Preliminary Injunction against an improper legal standard, and this Court must therefore reverse.

### A.     *Whitaker* and *Martinsville* Create Logical and Legal Inconsistencies.

The Seventh Circuit's opinions in *Whitaker* and *Martinsville* create logical and legal inconsistencies.  Contrary to this Honorable Court's contentions, nothing in Title IX or the Equal Protection Clause mandates the District allow Doe access to the girls' restroom.

Title IX provides no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Importantly, however, Title IX also indicates "nothing herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes."  20 U.S.C. § 1686.  In this same vein, Title IX's implementing regulations allow schools to "provide separate toilet, locker room, and shower facilities on the basis of sex," provided such facilities are comparable regardless thereof.  34 C.F.R. § 106.33.  Accordingly, Title IX expressly allows educational institutions to provide separate living, restroom, and shower facilities based on sex notwithstanding its prohibition of sex-based exclusion from participation in educational programming and/or activities.  Therefore, express language within Title IX and its corresponding regulations authorizes sex-segregated facilities.   Further, it was physical and anatomical differences between the sexes, and individual privacy interests relating thereto, that prompted this exception for sex-based distinctions in terms of living, restroom, and shower facilities.  *See* 118 Cong. Rec. 5807 (1972) (statement of Sen. Bayh).  Accordingly, it follows that "sex" meant to differentiate males from females on a physical and anatomical basis as used throughout the statute.

Notwithstanding the foregoing, this Court in *Whitaker* and *Martinsville* noted neither Title IX nor its implementing regulations define "sex," and, on that basis, rejected the notion "sex" serves to differentiate male from female according to 20 U.S.C. § 1686 and 34 C.F.R. § 106.33. For example, the Seventh Circuit in *Martinsville* stated the following, in pertinent part:

> We concluded [in *Whitaker*] that bathroom-access policies that engaged in sex-stereotyping could violate Title IX, notwithstanding 34 C.F.R. § 106.33. Similarly, section 1686 is of little relevance to this appeal. Though it certainly permits maintenance of sex-segregated facilities, we stress again that neither the plaintiff in *Whitaker* nor the plaintiffs in these cases have any quarrel with that rule. The question is different: who counts as a "boy" for the boys' restrooms, and who counts as a "girl" for the girls' rooms—essentially, how do we sort by gender? The statute says nothing on this topic, and so nothing we say here risks rendering section 1686 a nullity.

75 F.4th at 770. However, this statement misconstrues the issue: if "sex" truly evades definition under the statute, and therefore includes gender-based discrimination, then how can a school establish sex-segregated facilities under 34 C.F.R. § 106.33? In other words, if "sex" is a fluid, subjective state of mind, the statutory provision concerning "sex-segregated facilities" is rendered meaningless. Congress intentionally chose the term "sex"—rather than "gender"—throughout Title IX. And if the term "sex" serves to differentiate males from females when used in 20 U.S.C. § 1686 and 34 C.F.R. § 106.33, then it must carry the same meaning throughout the whole of Title IX. *See, e.g., United States v. Sparkman*, 973 F.3d 771, 775 (7th Cir. 2020) ("[I]dentical words used in different parts of the same statute are generally presumed to have the same meaning.") (internal citation omitted).

In *Martinsville*, this Honorable Court took the position the term "sex," standing alone, could not be assumed to mean biological sex. 75 F.4th at 770. However, in *Bostock v. Clayton County*, the Supreme Court confronted the same issue— i.e., the denotation of the word "sex" standing alone. 140 S. Ct. 1731 (2020). In that case, the Supreme Court "proceed[ed] on the assumption" the term "sex," as used in Title VII, "refer[ed] only to biological distinctions between

20

male and female." 140 S. Ct. at 1739 (emphasis added).  The Eleventh Circuit Court of Appeals

took note of this position in stating the following:

> Neither case reads "gender identity" into the definition of "sex"; they discuss
> unlawful action by employers' reliance on impermissible stereotypes. And, as
> discussed above, "sex" is not a stereotype. Just as importantly, and contrary to
> Adams's arguments that *Bostock* equated "sex" to "transgender status," the Supreme
> Court in *Bostock* actually "proceed[ed] on the assumption" that the term "sex," as
> used in Title VII, "refer[ed] only to biological distinctions between male and
> female." 140 S. Ct. at 1739 (emphasis added).

> There simply is no alternative definition of "sex" for transgender persons as
> compared to nontransgender persons under Title IX. The district court erred by
> divining one, and applying that definition to Adams, because courts must "avoid
> interpretations that would `attribute different meanings to the same phrase'" or word
> in "all but the most unusual" of statutory circumstances.

*Adams*, 57 F.4th at 813-814.

By contrast this Honorable Court conflated the concepts of "sex" with "gender" in

*Whitaker* and *Martinsville*. But the two words are neither synonymous nor interchangeable.  For

example, the Yale School of Medicine has taken the following approach[10]:

- In the study of human subjects, the term sex should be used as a classification,
  generally as male or female, according to the reproductive organs and functions
  that derive from the chromosomal complement [generally XX for female and XY
  for male].

- In the study of human subjects, the term gender should be used to refer to a person's
  self-representation as male or female, or how that person is responded to by social
  institutions on the basis of the individual's gender presentation.

- In most studies of nonhuman animals, the term sex should be used.

Likewise, the National Institutes of Health frames the issue in this manner[11]:

> Sex

---

[10] Carolyn M. Mazure, *What Do We Mean By Sex and Gender?*, Yale Sch. Of Med., Sept. 19, 2021,
https://medicine.yale.edu/news-article/what-do-we-mean-by-sex-and-gender/.
[11] Office of Research on Women's Health, *What Are Sex & Gender?*, Nat'l Inst. of Health,
https://orwh.od.nih.gov/sex-gender.

Sex is a multidimensional biological construct based on anatomy, physiology, genetics, and hormones. (These components are sometimes referred to together as "sex traits.")  All animals (including humans) have a sex. As is common across health research communities, NIH usually categorizes sex as male or female, although variations do occur. These variations in sex characteristics are also known as intersex conditions. . . .

Gender

Gender is relevant only for research with humans (not other animals). Gender can be broadly defined as a multidimensional construct that encompasses gender identity and expression, as well as social and cultural expectations about status, characteristics, and behavior as they are associated with certain sex traits. Understandings of gender vary throughout historical and cultural contexts.

Additionally, the World Health Organization states as follows[12]:

Gender refers to the characteristics of women, men, girls and boys that are socially constructed.  This includes norms, behaviours and roles associated with being a woman, man, girl or boy, as well as relationships with each other. As a social construct, gender varies from society to society and can change over time. . . .

Gender interacts with but is different from sex, which refers to the different biological and physiological characteristics of females, males and intersex persons, such as chromosomes, hormones and reproductive organs. Gender and sex are related to but different from gender identity. Gender identity refers to a person's deeply felt, internal and individual experience of gender, which may or may not correspond to the person's physiology or designated sex at birth.

Similarly, the American Medical Women's Association takes the following position[13]:

"Sex" refers to biological differences between females and males, including chromosomes, sex organs, and endogenous hormonal profiles. "Gender" refers to socially constructed and enacted roles and behaviors which occur in a historical and cultural context and vary across societies and over time. All individuals act in many ways that fulfill the gender expectations of their society. With continuous interaction between sex and gender, health is determined by both biology and the expression of gender. — Definition according to the National Institutes of Health (NIH) Office of Research on Women's Health (ORWH).

The terms sex and gender have often been used interchangeably and imprecisely even though they should not be. The terms refer to different things.

---

[12] *Fact Sheet on Gender and Health*, World Health Org., https://www.who.int/healthtopics/gender#tab=tab_1.

[13] Sex and Gender Health Collaborative, *Defining Sex and Gender*, Am. Med. Women's Ass'n, https://www.amwa-doc.org/sghc/defining-sex-and-gender/.

The American Psychiatric Association defines the terms as follows[14]:

> Gender has two components:
>
> 1. Gender identity – a person's basic internal sense of being a man, woman, and/or another gender (e.g., gender queer, gender fluid).
>
> 2. Gender expression – conveyed through appearance (e.g., clothing, make up, physical features), behaviors, and personality styles. These means of expression are often culturally defined as masculine or feminine. The ways in which people express their gender identity are both particular to each individual and variable across cultures.
>
> Sex is often described as a biological construct defined on an anatomical, hormonal, or genetic basis. In the U.S., individuals are assigned a sex at birth based on external genitalia.

Finally, Merriam Webster proffers the following definitions[15]:

> 1a: either of the two major forms of individuals that occur in many species and that are distinguished respectively as female or male especially on the basis of their reproductive organs and structures. . . .
>
> 1c: the state of being male or female. . . .
>
> Among those who study gender and sexuality, a clear delineation between sex and gender is typically prescribed, with sex as the preferred term for biological forms, and gender limited to its meanings involving biological, cultural, and psychological traits.

When this Honorable Court said, "[t]here is insufficient evidence to support the assumption that sex can mean only biological sex," it was confusing sex and gender and wholly disregarding the collective wisdom and guidance from the medical and scientific community. While "gender" may be a fluid concept, "sex" is not. Congress chose the word "sex," not "gender," when drafting Title IX and, as such, the word must be given its proper meaning.

---

[14] Psychiatry.org, *Definitions of Gender, Sex, and Sexual Orientation and Pronoun Usage*, Am. Psychiatric Ass'n, https://www.psychiatry.org/psychiatrists/diversity/education/transgender-and-gender-nonconforming-patients/definitions-and-pronoun-usage.
[15] *Sex*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/sex.

The *Martinsville* Court also took the position nothing in Title IX or the implementing regulations offered guidance on the meaning of "sex." 75 F.4th at 770. This, too, is inaccurate. Section 106.41, Athletics, provides as follows:

> (b) *Separate teams*. Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor ***separate teams for members of each sex*** where selection for such teams is based upon competitive skill or the activity involved is a ***contact sport***. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes of this part, ***contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact***.

34 CFR § 106.41(b) (emphasis added). If "sex" is not based on physical and anatomical differences between two distinct biological categories of individuals, this exception would be rendered meaningless. However, in drafting Title IX and its implementing regulations, Congress recognized there were two sexes, wholly distinguished by physical and anatomical differences, which required certain separate treatment. How one dresses, behaves, and identifies—though this may suggest or otherwise impinge on gender identity—does nothing to alter that analysis concerning "sex," for if it did, this language would be rendered a nullity.

Moreover, the Seventh Circuit's interpretation of Title IX in *Whitaker* and *Martinsville* threatens to undermine all equities created and intended by the statute, particularly in the field of women's athletics. Under Title IX, an educational institution must provide male and female athletes with equal access to financial aid, meaning that funds allocated to athletic scholarships must be proportionate to the participation of male and female athletes. *See generally* 34 C.F.R. 106.41, 106.37(c). Under the Court's interpretation of "sex," an athletic program could only provide scholarships to male athletes and not run afoul of Title IX if half of them identified as female. Certainly, such an absurd interpretation would not pass judicial muster. Plaintiff will

likely mock this hypothetical, but to do so ignores the struggle female athletes have endured over the fifty years Title IX has been in existence. It would also ignore the lengths to which some institutions of higher education have gone to skirt their obligations under Title IX.

In this case, Doe is an 11-year-old student who has male genitalia and was assigned male at birth but identifies as female. The District Court has barred the District from requiring Doe to (1) share a bathroom with other 11-year-old students who also have male genitalia; or (2) use a single-user, gender-neutral bathroom. [Dkt. ##15, 16]. Specifically, the District Court has taken the position Doe is engaging in "gender nonconformity" by presenting as a girl; that "a policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance which in turn violates Title IX" pursuant to *Whitaker*; and as such, the District's policy violates Title IX. [Dkt. #15, p. 11]. But what if this case concerned an 11-year-old student who was born with male genitalia, was assigned male at birth, and identifies at male, but prefers to use the girls' bathroom? By preferring and/or using the girls' bathroom, this student would arguably be engaging in gender nonconformity. Would the District be violating Title IX by requiring him to use the boys' bathroom and therefore punishing him for his gender non-conformance? Based on the Seventh Circuit's interpretation, the answer would be "yes," notwithstanding Title IX's explicit authorization of sex-segregated restrooms.

*Martinsville* supports this wholly illogical conclusion. In *Martinsville*, this Honorable Court concluded "that bathroom-access policies that engaged in sex-stereotyping could violate Title IX." 75 F.4th at 770. That means a school district with a policy requiring male students to use the boys' bathroom and female students to use the girls' bathroom would violate Title IX. For the sake of this hypothetical, take transgender students completely out of the analysis. A school

district could not punish the 11-year-old boy mentioned above for using the girls' bathroom purely out of preference because to do so would constitute unlawful sex-stereotyping (i.e., assuming male students use the boys' bathroom and female students use the girls' bathroom). The ability to create sex-separate facilities is rendered a complete nullity if the use of those separate facilities is open to all, regardless of sex.

Plaintiff-Appellee (and perhaps this Court) will likely respond to this hypothetical by saying Doe is different than the hypothetical 11-year-old boy, who certainly could be punished for entering the girls' bathroom. The District agrees with that position. However, in *Martinsville*, this Honorable Court stated, "[a]s *Bostock* instructs, we ask whether [plaintiff is] suffering negative consequences (for Title IX, the lack of equal access to school programs) for behavior that is being tolerated in male students who are not transgender." 75 F.4th at 769. If our 11-year-old boy is prohibited from using the girls' bathroom, just like Doe was prohibited from using the girls' bathroom, then Doe is not being punished for behavior that is tolerated in male students who are not transgender. Thus, there is no basis for Plaintiff-Appellee's position, which must fail.

### B.  *Whitaker* and *Martinsville* Obfuscate the Central Purpose Behind Title IX.

In addition to being logically incoherent, the Seventh Circuit's reasoning in *Whitaker* and *Martinsville* eviscerates the legislative purpose and intent of Title IX.

Title IX was introduced in Congress in direct "response to significant concerns about discrimination against women in education" and with two objectives in mind: (1) "to avoid the use of federal resources to support discriminatory practices"; and (2) "to provide individual citizens effective protection against those practices." *Neal v. Bd. of Trustees of Cal. State Univs.*, 198 F.3d 763, 766 (9th Cir. 1999); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979). And while Title

IX's application has expanded since its introduction to Congress in 1971, its foremost intent remains—providing equal access to educational opportunities, regardless of sex.

By allowing Doe access to the girls' restrooms based on this Court's reasoning in *Whitaker*, the District Court is denying Doe's female peers the equal access Title IX intended to afford by placing their privacy rights below those of Doe. As previously mentioned, the District Court barred the District from requiring Doe to share a bathroom with fellow students who possessed male genitalia. In so doing, the District Court is requiring elementary school female students to share a bathroom with a fellow student who possesses male genitalia. Unlike *Whitaker* and *Martinsville*, these are elementary school children, not high school students. These female elementary school children are now faced with two choices: (1) share a bathroom with a student who has male genitalia or (2) request permission to use a separate gender-neutral bathroom. These are the exact same options offered Doe, which the District Court found to run afoul of Title IX, yet the District Court has no hesitation to impose these options upon Doe's female peers. Thus, the District Court is denying equal treatment to these young girls and elevating the "rights" of Doe above theirs. Faced with this choice, parents of several student withdrew their children from summer school (a fact the District was not afforded the opportunity to present to the District Court), thus, again, denying educational opportunities to female students.

Moreover, by importing a Title VII framework into the Title IX analysis, the Seventh Circuit in *Whitaker* and *Martinsville* has overlooked the reality that "Title VII . . . is a vastly different statute from Title IX." *Jackson v. Birmingham Bd. of Educ*., 544 U.S. 167, 175 (2005). Whereas Title VII stands for the proposition that sex is "not relevant to the selection, evaluation, or compensation of employees," Title IX conversely requires universities to "consider sex in allocating athletic scholarships, 34 C.F.R. 106.37(c), and . . . take it into account in 'maintaining

27

separate living facilities for the different sexes [under 20 U.S.C. 1686]." *Bostock v. Clayton Cty.*, 140 S. Ct. at 1741 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989)); *Meriwether v. Hartop*, 992 F.3d 492, 510, n.4 (6th Cir. 2021). The Supreme Court highlighted this reality by explicitly declining to extend its ruling as it pertained to workplace sex discrimination (prohibited under Title VII) to issues pertaining sex-segregated restrooms and locker rooms (permitted by Title IX) in *Bostock*, 140 S. Ct. at 1753. Indeed, the Court even declined to address the impact of its holding for bathrooms and locker rooms in the workplace. *Id.* ("Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind.").

C.     **The Equal Protection Clause Permits the Provision of Sex-Segregated Restrooms.**

Finally, the District's policy requiring bathroom usage consistent with biological sex satisfies the Equal Protection Clause, contrary to this Court's assertions in *Whitaker* and *Martinsville*.

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 2. Such clause does not proscribe sex-based classifications, however; "[i]t simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Under the Equal Protection Clause, a policy that classifies based on sex is constitutional if it survives the two requirements of intermediate scrutiny. First, the government must demonstrate that the sex-based "classification serves important governmental objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (internal quotation marks omitted). Second, the government must show "the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* (internal quotation marks omitted).

28

Here, the District's decision to separate bathrooms by sex satisfies both prongs of the intermediate scrutiny analysis.  The District's Bathroom Use Policy fulfills the first prong by serving important objectives of protecting the privacy interests of students in using the restroom separately from the opposite sex, which in turn justifies the provision of separate bathrooms for female and male students.  *See, e.g.*, *Adams*, 57 F.4th 791.  The right to privacy has long been protected under the Constitution.  *See, e.g., Quilici v. Vill. Of Morton Grove*, 695 F.2d 261, 280 (7th Cir. 1982) ("The right to privacy is one of the most cherished rights an American citizen has; the right to privacy sets America apart from totalitarian states in which the interests of the state prevail over individual rights.").  Individuals have a legitimate and substantial interest in bodily privacy such that their nude body, genitalia, and other private parts are not exposed to persons of the opposite biological sex, and courts have consistently recognized that the need for such privacy inheres in human dignity.  *See, e.g., Doe v. Luzerne Cty.*, 660 F.3d 169, 176-177 (3d Cir. 2011); *Brannum v. Overton Cty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008); *Sepulveda v. Ramirez*, 967 F.2d 1413, 1416 (9th Cir. 1992); *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981).  Ensuring student privacy is especially important in the elementary school setting, wherein students are less mature and only "on the threshold of awareness of human sexuality."  *J.A. v. Fort Wayne Cmty. Schs.*, No. 1:12 CV 155 JVB, 2013 WL 4479229, *6 (N.D. Ind. Aug. 20, 2013).  As such, elementary-aged students "characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them." *J.D.B. v. North Carolina*, 564 U.S. 261, 272-73 (2011).

Moreover, separating elementary school restrooms by sex is substantially related to the achievement of the District's objectives of ensuring and maintaining student privacy, as students use the bathroom in a separate space from the opposite sex and are thereby protected against bodily

exposure to the opposite sex. Ultimately, the District implemented a policy that respects and protects the privacy rights of all students, pursuant to which all individuals—regardless of sex—are treated equally. Therefore, the provision of separate restrooms based on sex does not violate the Equal Protection Clause, and the District Court consequently erred in relying on contrary Seventh Circuit precedent.

## **CONCLUSION**

For the foregoing reasons, Defendants-Appellants respectfully request the Seventh Circuit reverse the decision of the District Court and deny Plaintiff-Appellee's request for a preliminary injunction.

Dated at Waukesha this 19th day of September, 2023.

Respectfully submitted,

_____/s/ *Joel S. Aziere*_____
Joel S. Aziere (WI Bar No.: 1030823)
jaziere@buelowvetter.com
Corinne T. Duffy (WI Bar No.: 1115664)
cduffy@buelowvetter.com

**Buelow Vetter Buikema Olson & Vliet, LLC**
20855 Watertown Road, Suite 200
Waukesha, Wisconsin 53186
Phone: (262) 364-0300
Facsimile: (262) 364-0320

*Attorneys for Defendants-Appellants, Mukwonago Area School District and Joseph Koch*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief conforms to Fed. R. App. P. 32 and Circuit Rule 32 for the following reasons:

1.     This brief complies with the type-volume limitations set forth in Circuit Rule 32(c) because it contains 9,864 words, calculated using the "Word Count" feature of Microsoft Word.

2.     This brief complies with the typeface and type style requirements set forth in Circuit Rule 32 because it has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Times New Roman.

Dated at Waukesha this 19th day of September, 2023.

BY:     _____/s/ *Joel S. Aziere*_____
        Joel S. Aziere (WI Bar No.: 1030823

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 19, 2023, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished thereby.

Pursuant to Circuit Rule 31(b), I certify that I will transmit fifteen (15) copies of this Appellate Brief of Defendants-Appellants to the Court within seven (7) days of receiving notice that this Court has accepted the electronic brief for filing.

Dated at Waukesha this 19th day of September, 2023.

BY:        /s/ *Joel S. Aziere*
          Joel S. Aziere (WI Bar No.: 1030823)

Case No. 23-2568

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

JANE DOE #1, a minor,
by her mother and next friend,
JANE DOE #2,

        Plaintiff-Appellee,

   v.

MUKWONAGO AREA SCHOOL DISTRICT,
and JOSEPH KOCH, in his official capacity as
Superintendent of Mukwonago Area School District,

        Defendants-Appellants.
.

Appeal from the United States District Court for the Eastern District of Wisconsin
Case No. 2:23-CV-876
The Honorable Judge Lynn Adelman

# SHORT APPENDIX OF DEFENDANTS-APPELLANTS,
# MUKWONAGO AREA SCHOOL DISTRICT AND JOSEPH KOCH

Joel S. Aziere (*counsel of record*)
Corinne T. Duffy
**Buelow Vetter Buikema**
**Olson & Vliet, LLC**
20855 Watertown Road, Suite 200
Waukesha, WI 53186
Phone: (262) 364-0300
Facsimile: (262) 364-0320

*Attorneys for Defendants-
Appellants, Mukwonago Area
School District and Joseph Koch*

## STATEMENT OF COMPLIANCE WITH CIRCUIT RULE 30(d)

I hereby certify that all of the materials required by Circuit Rule 30(a) and (b) are included in this appendix, and that such materials are included in an appendix bound with the foregoing brief because they do not exceed 50 pages, pursuant to Circuit Rule 30(b)(7).

Dated at Waukesha this 19th day of September, 2023.

BY: _____/s/ *Joel S. Aziere*_____
Joel S. Aziere (WI Bar No.: 1030823)

A2

## <u>TABLE OF CONTENTS</u>

July 11, 2023 Decision and Order on Plaintiff's Motion for Preliminary Injunction
(Dkt. #15)……………………………………………………………………A4-23

July 11, 2023 Preliminary Injunction
(Dkt. #16)………………………………………………………………....A24

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

JANE DOE #1, a minor, by her mother
and next friend, JANE DOE #2,
      Plaintiff,

    v.                               Case No. 23-C-0876

MUKWONAGO AREA SCHOOL
DISTRICT and JOE KOCH, in his
official capacity as Superintendent of
the Mukwonago Area School District,
      Defendants.

---

## DECISION AND ORDER

    Plaintiff Jane Doe #1,[1] an eleven-year-old transgender girl who attends school within the Mukwonago Area School District ("MASD"), brings this action against the district and its superintendent. She alleges that defendants have recently adopted a policy that prohibits her from using the girls' bathrooms at school. Under the policy, plaintiff must use either the boys' bathroom or designated bathrooms in administrative areas of the school that the district regards as gender-neutral. Plaintiff contends that enforcing this policy is a form of discrimination based on sex that is prohibited by both Title IX of the Education Amendments of 1972 and the Equal Protection Clause of the Fourteenth Amendment.

    Along with her complaint, plaintiff filed a motion for a temporary restraining order and a preliminary injunction. In a prior order, I granted the motion for a temporary

---

[1] Plaintiff has sought permission to litigate under a pseudonym because she is a minor. See Fed. R. Civ. P. 5.2(a). The court will grant such permission. Plaintiff's mother is also referred to as a Jane Doe to avoid revealing plaintiff's identity.

restraining order. In this order, I address plaintiff's motion for a preliminary injunction and more fully address the parties' arguments.

## I. BACKGROUND

Plaintiff is eleven years old and, in the fall, will enter the sixth grade at Prairie View Elementary School, an MASD school. Plaintiff is transgender. Although she was assigned male at birth, she expressed to her mother from a very young age that she saw herself as a girl. She began presenting and living as a girl at home when she was three years old. She began publicly presenting as a girl in first grade at the elementary school she attended prior to moving into the MASD. She began using female pronouns, grew out her hair, began wearing traditional girls' clothing, and adopted a more feminine name. Plaintiff has been diagnosed with gender dysphoria by a medical doctor and is under the care of a therapist for emotional and psychological support.

When she was entering third grade, plaintiff and her family moved to Waukesha County, and her parents enrolled her at Prairie View. Teachers and administrators at the school were supportive of plaintiff's transgender status. They referred to her by her feminine nickname, used female pronouns, and allowed her to use the girls' restrooms. This supportive stance continued through plaintiff's third- and fourth-grade years, and through most of fifth grade. Just like other female students, plaintiff participated in girls' groups whenever school activities were separated by gender. She also used the girls' bathrooms during the nearly three years she had attended Prairie View. Her use of the girls' bathrooms did not cause any disruption or concern during this period.

Around early April 2023, Prairie View's principal told plaintiff's mother that she had begun receiving phone calls from parents of other students expressing concern about

2

plaintiff's bathroom use at school. The principal also told plaintiff's mother that some parents and other residents of Waukesha County had created a Facebook group called "Mukwonago Parents for Normal Education." Group members were writing posts claiming that plaintiff was dangerous and that her parents might be pedophiles.

On May 15, 2023, the MASD school board held a closed executive meeting and discussed plaintiff's bathroom use and raised the possibility of requiring her to use a bathroom designated solely for transgender students or a single-occupancy, gender-neutral restroom. Plaintiff's mother attended part of the closed meeting and insisted that her daughter had the right to use the girls' bathroom. She explained that the board's proposed options would single plaintiff out from her peers, force her to reveal to others that she was transgender without her consent, and stigmatize her. The board did not make a decision that night but told plaintiff's mother that it was "stuck between a rock and a hard place" in that it could either upset parents who were opposed to plaintiff's presence and bathroom use at school by continuing to treat plaintiff as it had for the past three years or could be sued by plaintiff's family if it changed course and banned plaintiff from the girls' bathrooms.

On May 22, 2023, the board held a public meeting at which around eight members of the public spoke against plaintiff's using the girls' bathroom. As far as the record reveals, no member of the public pointed to any specific danger posed by plaintiff's continuing to use the girls' bathroom. Rather, the commenters "spoke angrily about transgender students' bathroom usage and complained about a 'boy' using the girls' restroom." (Decl. of Jane Doe #2 ¶ 17.) After the meeting, then-superintendent Shawn McNulty told plaintiff's mother that plaintiff could continue using the girls' bathroom if she

3

provided a doctor's note confirming her gender dysphoria diagnosis. Plaintiff's mother promptly provided the doctor's note, and plaintiff continued using the girls' restroom at Prairie View.

However, on May 23, 2023, the president of the school board sent the following email to parents and students in the district:

> During the School Board meeting on May 22, 2023, a number of residents . . . voiced concerns over bathroom usage in our school district. The School Board of the [MASD] affirms its position that students should use the locker rooms and bathrooms of their sex at birth. The School Board directs administration to review any current accommodation plans, create a formal team-based process to address any gender-based accommodation requests, and implement plans accordingly. The School Board will develop policy during the summer of 2023 to address bathroom and locker room accommodation requests to be implemented prior to the start of the 2023–24 school year.

(ECF No. 5-3.)

Later that week, plaintiff's mother received a call from Christine Bowden, MASD's Director of Pupil Services, who told plaintiff's mother that she wanted to refer plaintiff for a special-education assessment based on her ADHD and anxiety diagnoses. Plaintiff's mother was confused about why the school was raising the possibility of special education at this time, when plaintiff was doing well at school and did not need additional support for ADHD or anxiety. Plaintiff's mother thought that this might be a form of retaliation for her opposition to the district's new stance on plaintiff's bathroom usage, and she did not consent to the referral. Bowden also told plaintiff's mother that MASD intended to develop a "Gender Support Plan," which she said would allow plaintiff to be called by her preferred name, would "put privacy policies in place," and give plaintiff a "support ladder" to use in the event of a problem. (Decl. of Jane Doe #2 ¶ 22.) Plaintiff's mother was again confused, as students were already allowed to be called by their preferred names, had

4

privacy rights, and were aware of how to contact support staff in the event of problems. Nonetheless, plaintiff's mother told Bowden to let her know when the district had an actual plan to discuss. After the call, Bowden sent plaintiff's mother paperwork relating to the special-education referral. The paperwork related to ADHD and anxiety and made no reference to gender dysphoria. Because plaintiff's mother did not believe that plaintiff needed additional support for her ADHD and anxiety, she declined the referral.

Plaintiff is enrolled in a summer-school program known as MASD Summer Adventures that began on June 19, 2023. She had attended the same program, which is held at Mukwonago High School, over the previous two summers. During those summers, plaintiff used the girls' restrooms near her classes without incident. However, on June 16, 2023, plaintiff's mother received an email that contained a letter to her from Joe Koch, the new superintendent of MASD. It provided in relevant part:

> On May 23, 2023, the school board released the attached communication regarding students using the restrooms and locker rooms of their assigned sex at birth. As a result, [Jane Doe #1] may use a gender-neutral or male bathroom starting on the first day of summer school, Monday June 19th.
>
> If [Jane Doe #1] wishes to access a gender-neutral bathroom, they are located in the main office entering through the AP door and the health room on the first floor. We can provide a map identifying the location of [Jane Doe #1's] summer school classes and the nearest staircases to the restrooms, as well as a staff-led review of the pathways to those restrooms on the first day of summer school.

(ECF No. 5-5.) Plaintiff's mother told plaintiff about the letter, and she became upset and confused.

When plaintiff began summer school, she used the girls' bathroom as usual. However, by June 22, 2023, it was apparent that MASD was monitoring plaintiff's bathroom usage. On that day, plaintiff's mother received an email from the school district

5

reminding her of the new policy and noting that plaintiff was seen using the girls' bathroom during summer school. The school also sent plaintiff's mother a map showing the locations of the bathrooms the school regarded as gender-neutral. These bathrooms are located farther from plaintiff's classes than the girls' bathrooms that other girls at the school use. Moreover, the bathrooms in the administrative office are not actually gender-neutral student bathrooms. They are meant to be used by adult administrative staff and are separately labeled male and female.

On multiple occasions during summer school, plaintiff has been pulled out of class and taken to the principal's office in response to her using the girls' bathroom. During these interactions, staff remind plaintiff of the school's expectation that she use only the boys' bathrooms or the bathrooms in the administrative office and health room. Plaintiff finds these interactions upsetting, as they involve her being told that she must use bathrooms that the other children do not use or must use boys' bathrooms when she is not a boy. An email that plaintiff sent to her mother from school highlights how the school's policy has affected her:

> Mrs. Shultz, and the principal just brought me into the special Ed office to just give me a "Reminder" that "The school board has expectations" (😔). And that I have to use the boys' bathroom or a gender neutral restroom 😔😔😔. I think I need to come home, and the school is going to call you as well. So Please come pick me up *BEFORE* they call please. I am trying to hold back my emotions. So please hurry! 😭😭😭😭😭😭

(ECF No. 5-10.)

Plaintiff's mother is concerned that if the school district continues to enforce its bathroom policy during summer school, plaintiff will begin avoiding the bathrooms at school altogether. Such behavior might be physically harmful to plaintiff, as she has been

experiencing gastrointestinal issues and has been advised by her doctor that she should

not delay using the bathroom.

On June 26, 2023, MASD adopted a formal bathroom policy for the district, known

as Policy 5514. It provides:

> The Board believes students should feel safe and secure in the school
> environment, and the Board respects their right to privacy as it pertains to
> the use of District facilities. To that end, except as otherwise required by
> law, students shall use restroom and locker room facilities on District
> property and at District-sponsored events according to each student's
> original sex assigned at birth.
>
> Student and/or parent requests for an exception or accommodation to this
> policy shall be considered by a team of District staff on a case-by-case basis
> in consultation with the student, the student's parents, the Director of
> Student Services, the school psychologist, the school counselor, the
> classroom teacher, the building principal, and any other individuals the
> District deems appropriate. All decisions relating to such requests will take
> into consideration the safety and privacy of all students.
>
> Accommodations for a diagnosis of gender dysphoria shall be addressed in
> accordance with Section 504 of the Rehabilitation Act of 1973, and the
> District's corresponding procedures for developing Section 504 Plans.
>
> The Administration shall develop administrative guidelines for the
> implementation of this policy and the provisions herein.

(ECF No. 5-16.)

Through counsel, plaintiff's mother has asked the district to restore plaintiffs'

access to the girls' bathrooms without litigation. Plaintiff's lawyers wrote a letter to the

district in which they explained that its policy contravened Title IX and the Equal Protection

Clause, as the Seventh Circuit interpreted those provisions of law in *Whitaker v. Kenosha*

*Unified School District*, 858 F.3d 1034 (7th Cir. 2017). The district's counsel responded

to the letter and did not dispute that its policy was inconsistent with *Whitaker*. However,

counsel noted that the district's policy allowed for accommodations and exceptions, and

7

A10

that the district had been trying to accommodate plaintiff by providing her with access to a "trusted adult" while at school and by allowing her to use the boys' bathroom or the bathrooms in the administrative office and health room. (ECF No. 5-14.) Counsel also noted the school's attempt to assess plaintiff for special-education services. Counsel ended his letter by stating that the district wished to "engage with the family and carry out the processes outlined in its policy." (*Id.*) But counsel did not suggest that the district would consider making a true "exception" to its policy for plaintiff by allowing her to continue using the girls' restrooms as she had been doing for the last three years.

On June 29, 2023, plaintiff's counsel responded to the district's letter and indicated that plaintiff would file a lawsuit and seek an emergency restraining order if the school did not agree to temporarily suspend enforcement of its policy while the parties discussed the possibility of a non-judicial resolution. Plaintiff's counsel asked the district to inform them immediately if it was willing to agree to temporarily suspend the new policy while the parties had further discussions. Defense counsel did not respond to plaintiff's request, and plaintiff filed this lawsuit at the end of the day on June 30, 2023.

Plaintiff's complaint alleges that the district's refusal to allow her to continue using the girls' bathrooms violates both Title IX and the Equal Protection Clause. Along with her complaint, plaintiff filed a combined motion for a temporary restraining order and a preliminary injunction. Both motions seek an order restraining the district from: (1) enforcing against plaintiff any policy, practice, or custom that denies plaintiff access to girls' restrooms at school and school-sponsored events; and (2) taking any formal or informal disciplinary action against plaintiff for using girls' restrooms at school and school-sponsored events. The factual assertions underlying these motions are supported by

8

declarations and exhibits. The district filed a written response to both motions on July 4, 2023. The district did not submit its own declarations and relies on many of the same exhibits that plaintiff included with her own motion. Plaintiff filed a reply brief on July 5, 2023. No party has asked for an evidentiary hearing on the motions.

In a short order issued on the morning of July 6, 2023, I granted plaintiff's motion for a temporary restraining order. In the same order, I noted that I would take the motion for a preliminary injunction under advisement and issue a more detailed opinion on that motion soon. I address the motion for a preliminary injunction in this opinion.

## II. DISCUSSION

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 20 (2008). "The first step in the analysis requires a plaintiff to 'demonstrate that [his] claim has some likelihood of success on the merits, not merely a better than negligible chance.'" *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 792 (7th Cir. 2022) (quoting *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020)). In assessing the balance of equities, "the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Mays*, 974 F.3d at 818. This balancing process involves a "sliding scale" approach: "the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Id*.

9

## A.     Likelihood of Success on the Merits

Plaintiff's claims arise under Title IX and the Equal Protection Clause of the Fourteenth Amendment. Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance. . . ." 20 U.S.C. § 1681(a). The parties agree that MASD receives federal funds and is a covered institution. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). It protects against intentional and arbitrary discrimination. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). Generally, state action is presumed to be lawful and will be upheld if the classification drawn by the statute is rationally related to a legitimate state interest. *City of Cleburne*, 473 U.S. at 440. This rational-basis test, however, does not apply when a classification is based on sex. *Whitaker*, 858 F.3d at 1050. When a sex-based classification is used, the burden rests with the state to demonstrate that its proffered justification is "exceedingly persuasive." *United States v. Virginia*, 518 U.S. 515, 533 (1996). This requires the state to show that the "classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* (internal quotation marks omitted). It is not sufficient to provide a hypothesized or *post hoc* justification created in response to litigation. *Whitaker*, 858 F.3d at 1050. Nor may the justification be based upon overbroad generalizations about sex. *Id.* Instead, the justification must be genuine. *Id.*

10

In *Whitaker*, the Seventh Circuit reviewed a district court's decision to issue a preliminary injunction to a transgender high-school student who alleged that the school's refusal to allow him to use the boys' restroom violated both Title IX and the Equal Protection Clause. Under the likelihood-of-success-on-the-merits element, the Seventh Circuit interpreted both Title IX and the Equal Protection Clause to extend protection to transgender students who wish to use the school bathroom that matches their gender identity. With respect to Title IX, the court held that "[a] policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX." *Whitaker*, 858 F.3d at 1049. Similarly, the court held that subjecting a transgender student "to different rules, sanctions, and treatment than non-transgender students" violated Title IX. *Id.* The court held that providing "a gender-neutral alternative" did not relieve the school district from liability under Title IX because it was the policy itself that violated Title IX. *Id.* at 1050.

With respect to the Equal Protection Clause, the court held that a school district's deciding which bathroom a student may use based upon the sex listed on the student's birth certificate was "inherently based upon a sex-classification" and that therefore heightened review applied. *Id.* at 1051.The court further held that the school district had failed to provide a justification for its sex-based policy that was exceedingly persuasive. *Id.* at 1051–52. The justification that the district had offered was that the policy was necessary to protect the privacy rights of all students. *Id.* at 1052. The court rejected this justification on the ground that it was "based upon sheer conjecture and abstraction." *Id.* at 1052. The court noted that the plaintiff had used the boys' bathroom at school for nearly

11

six months without incident. *Id.* Further, the court deemed complaints from a teacher, one parent, and "several community members" insufficient to show that the policy was necessary to protect the privacy rights of all students. *Id.* Finally, the court noted that the school's policy "d[id] nothing to protect the privacy rights of each individual student vis-à-vis students who share similar anatomy and . . . ignore[ed] the practical reality of how [the plaintiff], as a transgender boy, use[d] the bathroom: by entering a stall and closing the door." *Id.* The court continued:

> A transgender student's presence in the restroom provides no more of a risk to other students' privacy rights than the presence of an overly curious student of the same biological sex who decides to sneak glances at his or her classmates performing their bodily functions. Or for that matter, any other student who uses the bathroom at the same time. Common sense tells us that the communal restroom is a place where individuals act in a discreet manner to protect their privacy and those who have true privacy concerns are able to utilize a stall. Nothing in the record suggests that the bathrooms at Tremper High School are particularly susceptible to an intrusion upon an individual's privacy.

*Id.*

Obviously, the decision in *Whitaker* is highly relevant here. First, it establishes the legal principle that a policy preventing a transgender student from using the bathroom that matches the student's gender identity is a form of discrimination on the basis of sex that violates Title IX, and that providing a gender-neutral alternative does not cure the discrimination. Second, it establishes the legal principle that such a policy is subject to heightened scrutiny under the Equal Protection Clause and that a school's unsubstantiated claim that the policy is necessary to protect the privacy of all students will not satisfy the school's burden to provide an "exceedingly persuasive" justification for the policy. These legal principles are controlling here.

Further, this case is not factually distinguishable from *Whitaker* in a way that diminishes plaintiff's likelihood of success. Defendants contend that this case is different because, while *Whitaker* involved a high-school student, this case involves an eleven-year-old student in the fifth and sixth grades. But defendants point to nothing in the court's Title IX or Equal Protection analysis that turned on the age of the student. Nor do defendants develop an argument showing that Title IX allows elementary schools to engage in types of sex-based discrimination that high schools may not. At most, the age difference might be relevant to whether defendants have provided an "exceedingly persuasive" justification for their discrimination that satisfies the Equal Protection Clause. But defendants do not develop an argument that specifically mentions the Equal Protection Clause or the "exceedingly persuasive" standard.

What defendants do say about the age difference between this case and *Whitaker* is that, "[a]t 11 years old, students are beginning to discuss and witness the impact of puberty and sexuality; many students' bodies begin to change at this age, and their understanding of the world gains nuance." (Br. in Opp. at 12.) Defendants also note that "11-year-olds are less emotionally mature than 18-year-olds." (*Id.*) However, defendants do not explain how these facts about early adolescence justify preventing an eleven-year-old transgender girl from using the girls' bathroom. Presumably, girls in the fifth and sixth grades at MASD use the bathroom in the same manner as the high-school student in *Whitaker*: by entering a stall and closing the door. 858 F.3d at 1052. Thus, each student will naturally protect her own privacy. Moreover, as in *Whitaker*, the record here discloses no way in which a transgender student's presence in the restroom provides a greater risk

13

A16

to other students' privacy rights "than the presence of an overly curious student of the same biological sex." *Id.*[2]

Defendants also contend that I should somehow discount the Seventh Circuit's decision in *Whitaker* because the "legal landscape" is allegedly different today than it was in 2017, when *Whitaker* was decided. (Br. in Opp. at 12.) Here, defendants primarily rely on the fact that the Eleventh Circuit has taken a different view of how Title IX and the Equal Protection Clause apply to a school policy that prevents a transgender student from using a bathroom that matches his or her gender identity. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022). However, in a hierarchical court system, decisions of a superior court are authoritative on inferior courts, and therefore a district court in the Seventh Circuit must follow the decisions of that circuit. *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004); *Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119, 123 (7th Cir. 1987). Thus, I am bound by the Seventh Circuit's interpretations and applications of Title IX and the Equal Protection Clause in *Whitaker*. And, for the reasons explained above, under *Whitaker*, plaintiff has a substantial likelihood of success on the merits.

**B.     Plaintiff's Irreparable Harm**

To obtain a preliminary injunction, plaintiff must also establish that she will likely suffer irreparable harm if the injunction is not granted. *Whitaker*, 858 F.3d at 1044–45. Harm is irreparable if legal remedies are inadequate to cure it. *Life Spine, Inc. v. Aegis*

---

[2] I note that Policy 5514 states that the MASD adopted it, in part, to protect "the safety . . . of all students." (ECF No. 5-16.) Defendants do not raise this safety justification in their brief, and the record discloses no way in which plaintiff's use of the girls' restroom affects the safety of other students.

14

*Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). "Inadequate 'does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered.'" *Id.* (quoting *Foodcomm Int'l v. Barry*, 328 F.3d 300, 305 (7th Cir. 2003)).

The record establishes that plaintiff will suffer irreparable harm in the absence of an injunction. Plaintiff's mother has submitted a declaration in which she describes the effect that MASD's policy has had on plaintiff during the short time it was enforced. (ECF No. 30 & 32 (redacted version).) She explains that, when school employees told plaintiff that she could no longer use the girls' bathrooms, plaintiff became "extremely distressed and upset" and began having "thoughts of self-harm." (*Id.* ¶ 25.) Plaintiff's mother also explains that plaintiff found it "devastating" to be told that she had to use separate bathrooms from the other children or use the boys' bathrooms when she is not a boy. (*Id.* ¶ 27.) And she describes how enforcement of the school's policy has had a stigmatizing and ostracizing effect on plaintiff that has diminished her academic motivation and ability to learn. (*Id.* ¶¶ 32–35.) Plaintiff's own emails to her mother, which she sent while at school, confirm that the policy has caused emotional and psychological harms and that it will continue to do so if not enjoined. (ECF Nos. 22 & 24.) Finally, plaintiff's mother notes that plaintiff has been experiencing gastrointestinal issues that could be exacerbated if plaintiff decided to avoid using the bathroom as a result of defendants' policy. (ECF No. 32 ¶ 28.) The Seventh Circuit has recognized that physical, psychological, and educational harms such as these are irreparable and that monetary damages would be an inadequate remedy. *Int'l Assoc. of Firefighters, Local 365 v. City of East Chicago*, 56 F.4th 437, 452 (7th Cir. 2022); *Whitaker*, 858 F.3d at 1045–46; *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 853 (7th Cir. 1999). Moreover, where, as here,

the deprivation of a constitutional right is ongoing, a court will ordinarily presume irreparable harm. *See, e.g., Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011).

Defendants do not dispute that the harms described by plaintiff's mother are generally considered irreparable. Instead, they contend that plaintiff would not suffer these harms if her family engaged in the process alluded to in Policy 5514 in which a student's parents may meet with various school staff members and administrators to have them consider the parents' or student's "requests for an exception or accommodation." (ECF No. 5-16.) However, defendants do not represent that this process could result in the district's making a true "exception" to the policy that would allow plaintiff to use the girls' bathroom. Instead, they seem to suggest that, through the process, the district might be able to alleviate the harmful psychological effects of its own discrimination. The only potential accommodations that defendants describe are access to a "trusted adult," the option to use the boys' restroom or a gender-neutral restroom, providing a map of the building to enable plaintiff to find the location of the restrooms the district regards as gender-neutral, and evaluating plaintiff for special-education services. (Br. in Opp. at 10.)

The existence of this accommodation process does not lessen the likelihood that plaintiff will suffer irreparable harm without an injunction. It is the district's policy of illegal discrimination that is the source of plaintiff's irreparable harm, and no amount of "accommodation" could remedy the harmful psychological effects of that discrimination. Defendants are depriving plaintiff of a basic human need that is central to her identity. The only way to prevent this harm is to end the discrimination. In any event, the record shows that plaintiff's mother has thoroughly engaged with the school and the district about plaintiff's needs and has already received whatever accommodations the district is willing

16

to provide, including the map and access to a trusted adult. Those accommodations did not eliminate plaintiff's suffering. Although plaintiff's mother declined the district's offer to evaluate plaintiff for special-education services, that referral could not have alleviated the psychological effects of defendants' illegal discrimination.

Accordingly, I find that plaintiff is likely to suffer substantial irreparable harm in the absence of a preliminary injunction.

## C.    Balance of Harms and Public Interest

What remains is to determine whether granting an injunction will harm defendants or the public as a whole. *Whitaker*, 858 F.3d at 1054. In their brief, defendants do not claim that they or the public would suffer irreparable harm if the injunction were granted. Moreover, the Seventh Circuit's application of these factors in *Whitaker* is controlling here. In *Whitaker*, the Seventh Circuit found an absence of harm to the district or the public based on the fact that the student had used the boys' bathroom at school for six months without incident. *Id.* at 1054. Here, plaintiff used the girls' bathroom for nearly *three years* without incident. Likewise, as in *Whitaker*, here the school has not presented evidence that plaintiff's presence in the girls' restroom has ever resulted in the invasion of any student's privacy. *Id.*

In *Whitaker*, the Seventh Circuit also discussed evidence submitted by school administrators from around the country showing that, in their experience, "the frequently-raised and hypothetical concerns about a policy that permits a student to utilize a bathroom consistent with his or her gender identity have simply not materialized." *Id.* at 1055. These administrators reported, instead, that "in their combined experience, all students' needs are best served when students are treated equally." *Id.* Further, the

17

administrators reported that, although some had worried that "implementing an inclusive policy will result in the demise of gender-segregated facilities in schools," that has not been the case. *Id.* Instead, the administrators found that "allowing transgender students to use facilities that align with their gender identity has actually reinforced the concept of separate facilities for boys and girls." *Id.* Based on this evidence, the Seventh Circuit determined that neither the school district nor the public would be harmed by allowing the plaintiff to continue using the bathroom that matched his gender identity. *Id.*

In the present case, defendants have not submitted evidence contradicting the experience of other schools as reflected in *Whitaker*. And because this case is otherwise indistinguishable from *Whitaker* with respect to the balance of harms and public interest, I find that those factors weigh strongly in favor of granting an injunction.

**D.    Defendants' Argument Concerning Status Quo**

Before concluding, I address defendants' argument that an injunction should not issue because it would change, rather than preserve, the status quo. Defendants claim that the status quo was the district's rule that plaintiff could not use the girls' bathrooms, which it adopted a few days before plaintiff filed this suit and sought preliminary relief. (Br. in Opp. at 14–15.)

Initially, I note that while some cases state that the purpose of a preliminary injunction is to "preserve the status quo," this formula is not part of the legal standard for deciding whether to issue an injunction, and it has been criticized by the Seventh Circuit and others. *See Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 943–44 (7th Cir. 2006) (collecting criticism); *Praefke Auto Elec. & Battery Co., Inc. v. Tecumseh Prods. Co.*, 255 F.3d 460, 464 (7th Cir. 2001). Under the actual legal standard,

"[p]reliminary relief is properly sought only to avert irreparable harm to the moving party."
*Chicago United*, 445 F.3d at 944. "Whether and in what sense the grant of relief would
change or preserve some previous state of affairs is neither here nor there." *Id.*

In any event, when courts employ the status quo formula, what they are referring
to is the state of affairs that existed "on the eve of the action that precipitated the dispute."
*Int'l Bhd. of Teamsters Airline Div. v. Frontier Airlines, Inc.*, 628 F.3d 402, 405 (7th Cir.
2010). Under this understanding of the formula, granting plaintiff a preliminary injunction
would preserve the status quo. For nearly three years, plaintiff was allowed to use the
girls' bathrooms at schools within the MASD. It was the school district's decision to
change course in June 2023 that altered the status quo and precipitated this dispute.
Thus, to the extent that the status quo is at all relevant to whether plaintiff is entitled to an
injunction, it favors issuance of the injunction.

### III. CONCLUSION

In sum, I find that plaintiff is likely to succeed on the merits of her claims, that she
would suffer irreparable harm in the absence of an injunction, and that the balance of
harms and the public interest favor issuance of an injunction. Accordingly, I will convert
the temporary restraining order to a preliminary injunction. Further, I find that plaintiff is
not required to post a bond or other security because there is no danger that defendants
will incur damages from the injunction. *See Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607
F.3d 453, 458 (7th Cir. 2010).

For the reasons stated, **IT IS ORDERED** that plaintiff's motion for a preliminary
injunction (ECF No. 5) is **GRANTED**. The Mukwonago Area School District,
Superintendent Joe Koch, and all officers, employees, and agents of defendants, are

19

hereby enjoined from: (1) enforcing against plaintiff any policy, practice, or custom that denies plaintiff access to girls' restrooms at school and school-sponsored events; and (2) taking any formal or informal disciplinary action against plaintiff for using girls' restrooms at school and school-sponsored events. To comply with Federal Rule of Civil Procedure 65(d)(1)(C)'s separate-document requirement, the court will issue a separate order embodying the injunction. *See MillerCoors LLC v. Anheuser-Busch Cos., LLC*, 940 F.3d 922, 922–23 (7th Cir. 2019).

  **IT IS FURTHER ORDERED** that plaintiff's motion for leave to file under seal (ECF No. 3) is **GRANTED**.

  Dated at Milwaukee, Wisconsin, this 11th day of July, 2023.

            /s/Lynn Adelman_____
            LYNN ADELMAN
            United States District Judge

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JANE DOE #1, a minor, by her mother
and next friend, JANE DOE #2,
      Plaintiff,

    v.                                 Case No. 23-C-0876

MUKWONAGO AREA SCHOOL
DISTRICT and JOE KOCH, in his
official capacity as Superintendent of
the Mukwonago Area School District,
      Defendants.

---

## PRELIMINARY INJUNCTION

**IT IS ORDERED** that the Mukwonago Area School District, Superintendent Joe Koch, and all officers, employees, and agents of defendants, are hereby restrained from: (1) enforcing against plaintiff any policy, practice, or custom that denies plaintiff access to girls' restrooms at school and school-sponsored events; and (2) taking any formal or informal disciplinary action against plaintiff for using girls' restrooms at school and school-sponsored events. The reason why this injunction issued is because the court found that plaintiff is likely to succeed on the merits of her claims, that she would suffer irreparable harm in the absence of an injunction, and that the balance of harms and the public interest favor issuance of an injunction.

Dated at Milwaukee, Wisconsin, this 11th day of July, 2023.


/s/Lynn Adelman
LYNN ADELMAN
United States District Judge