No. 23-2568

# In the
# United States Court of Appeals for the Seventh Circuit

JANE DOE #1, a minor,
by her mother and next friend, JANE DOE #2,

*Plaintiff – Appellee,*

v.

MUKWONAGO AREA SCHOOL DISTRICT,
and JOSEPH KOCH, in his official capacity as
Superintendent of Mukwonago Area School District,

*Defendant – Appellants.*

On Appeal from the United States District Court
for the Eastern District of Wisconsin, No. 2:23-cv-00876-LA

BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEE

Elizabeth B. Wydra
Brianne J. Gorod
David H. Gans
Jess Zalph*
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th St. NW, Suite 501
Washington, D.C. 20036
Tel.: (202) 296-6889

* Not admitted in D.C.; supervised
by principals of the firm

*Counsel for* Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

Pursuant to Circuit Rule 26.1, *amicus* states that the Constitutional Accountability Center is the only law firm that has appeared for *amicus* in this Court.

Dated: October 26, 2023                                  /s/ Elizabeth B. Wydra
                                                          Elizabeth B. Wydra

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

INTEREST OF *AMICUS CURIAE* ...................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 1

ARGUMENT ........................................................................................................ 4

    I.  Title IX Broadly Protects All Individuals, Including Transgender
        Individuals, from Gender Discrimination in Education by Recipients of
        Federal Financial Assistance ...................................................................... 4

   II.  The School Board's Policy Constitutes Unlawful Discrimination
        Under Title IX of the Civil Rights Act ....................................................... 9

CONCLUSION ..................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*,
  75 F.4th 760 (7th Cir. 2023) ....................................................... 8, 10, 11, 12, 13

*Adams v. Sch. Bd. of St. Johns County*,
  57 F.4th 791 (11th Cir. 2022) ..................................................... 13, 14

*Bostock v. Clayton County*,
  140 S. Ct. 1731 (2020) ............................................................. 3, 6, 7, 9

*Brown v. Bd. of Educ.*,
  347 U.S. 483 (1954) ................................................................. 5

*Burlington N. & Santa Fe Ry. Co. v. White*,
  548 U.S. 53 (2006) ................................................................... 9

*Cannon v. Univ. of Chi.*,
  441 U.S. 677 (1979) ................................................................. 6

*Chavez v. Credit Nation Auto Sales, LLC*,
  641 F. App'x 883 (11th Cir. 2016) ................................................ 8

*Davis v. Monroe Cty. Bd. Of Educ.*,
  526 U.S. 629 (1999) ................................................................. 6

*Dodds v. U.S. Dep't of Educ.*,
  845 F.3d 217 (6th Cir. 2016) ...................................................... 10

*Doe v. Boyertown Area Sch. Dist.*,
  897 F.3d 518 (3d Cir. 2018) ....................................................... 10

*Elwell v. Oklahoma ex rel. Bd. of Regents*,
  693 F.3d 1303 (10th Cir. 2012) ................................................... 6

*Franklin v. Gwinnett County Pub. Sch.*,
  503 U.S. 60 (1992) ................................................................... 8

*Gebser v. Lago Vista Indep. Sch. Dist.*,
524 U.S. 274 (1998)............................................................................6

*Glenn v. Brumby*,
663 F.3d 1312 (11th Cir. 2011) ..........................................................4

*Grimm v. Gloucester County Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020).............................................8, 10, 12, 14

*Haas v. Abrahamson*,
910 F.2d 384 (7th Cir. 1990)..............................................................13

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005)..........................................................................6, 9

*L.A. Dep't of Water & Power v. Manhart*,
435 U.S. 702 (1978)............................................................................7

*Price Waterhouse v. Hopkins*,
490 U.S. 228 (1989)............................................................................7

*Reed v. Reed*,
404 U.S. 71 (1971)..............................................................................5

*Regents of the Univ. of Cal. v. Bakke*,
438 U.S. 265 (1978).........................................................................5, 6

*Santos v. United States*,
461 F.3d 886 (7th Cir. 2006)..............................................................13

*United States v. Snyder*,
71 F.4th 555 (7th Cir. 2017)...............................................................13

*United States v. Virginia*,
518 U.S. 515 (1996)..........................................................................3, 7

*Whitaker v. Kenosha Unified Sch. Dist.*,
858 F.3d 1034 (7th Cir. 2017)............................................3, 4, 8, 9, 11

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

**Legislative and Regulatory Materials**

20 U.S.C. § 1681(a) ...........................................................................2, 4

20 U.S.C. § 1686 ...................................................................................11

34 C.F.R. § 106.33 ...............................................................................11

42 U.S.C. § 2000d .................................................................................5

42 U.S.C. § 2000e-2 ..............................................................................5

118 Cong. Rec. 5087 (1972) ................................................................12

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus* Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights and freedoms it guarantees. CAC has a strong interest in ensuring that the constitutional principle of equality is properly enforced and accordingly has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Jane Doe is an eleven-year-old transgender girl. She has a feminine name, wears traditionally feminine clothes, and has been supported as transgender since she enrolled in her current school in third grade. During this time, she has consistently used the girls' bathroom at school without incident.

Despite this, following a public meeting of the Mukwonago Area School District School Board ("the School Board") at which some members of the public "spoke angrily about transgender students' bathroom usage," Decl. of Jane Doe #2 ¶ 17, Superintendent Joe Koch emailed Jane Doe's mother and informed her that

---

[1] *Amicus* states that no counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to the brief's preparation or submission. Counsel for all parties have consented to the filing of this brief.

Jane Doe would no longer be able to use the girls' bathrooms, starting with the beginning of summer school. Instead, she would be required to use the boys' bathrooms or one of two gender-neutral bathrooms in the administrative office or the health room. The School Board subsequently adopted a formal policy for the whole district that requires students to use bathrooms that conform with their "original sex assigned at birth." Appellants App'x A10. In short, rather than treat Doe and other transgender students with equal respect, the School Board has adopted a policy that discriminates against them, shunting them away from their peers and marginalizing them.

The School Board's policy cannot be squared with the guarantees of Title IX of the Education Amendments of 1972, which, in sweeping, universal language, provides that "[no] person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Enforcing basic constitutional principles that require the government to respect the equal dignity of all persons, Title IX broadly prohibits sex discrimination by governmental and private entities that accept federal financial assistance, and thereby ensures to all people—regardless of their gender identity—"full citizenship stature—equal opportunity to aspire, achieve,

participate in and contribute to society based on their individual talents and capacities." *United States v. Virginia*, 518 U.S. 515, 532 (1996).

Transgender individuals are just as entitled to invoke these protections as anyone else. Title IX, like the Constitution's equal protection guarantee it enforces, applies to all persons, and ensures that "'[i]nherent differences' between men and women . . . remain cause for celebration, but not for denigration of the members of either sex or for artificial constraints on an individual's opportunity." *Id.* at 533. Under Title IX, transgender persons must be treated with equal dignity and given access to an educational environment where they can learn, thrive, and grow free from discrimination.

Title IX, like Title VII of the Civil Rights Act of 1964, establishes a "simple and momentous" command: "An individual's . . . transgender status is not [a] relevant" basis to deny an individual equal access to benefits or opportunities. *Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020). "That's because it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.* As this Court recognized in *Whitaker v. Kenosha Unified School District*, 858 F.3d 1034 (7th Cir. 2017), discrimination against a transgender individual for gender nonconformity is, under a theory of sex-stereotyping, sex discrimination under Title IX; a "person is defined as transgender precisely because of the perception that his or her behavior

transgresses gender stereotypes." *Id.* at 1048 (quoting *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011)). By denying Jane Doe access to the bathroom used by others girls, segregating her from the rest of the student body, and stigmatizing her, the School Board transgressed Title IX's broad mandate of sex equality and denied her the equal educational benefits and opportunities Congress sought to ensure.

## ARGUMENT

I.  **Title IX Broadly Protects All Individuals, Including Transgender Individuals, from Gender Discrimination in Education by Recipients of Federal Financial Assistance.**

Title IX, one of the nation's most broadly worded civil rights laws, prohibits all forms of sex discrimination in education by government and private entities that receive federal financial assistance. This ensures that the Constitution's promise of equality does not stop at the schoolhouse doors. Title IX's text, subject to narrow exceptions not relevant here, provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

Enacted in 1972, Title IX closed a gap in the Civil Rights Act of 1964. This gap permitted governmental and private actors to deny, on the basis of sex, equal access to educational opportunity, a basic right that lies at the "very foundation of

good citizenship," *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954).  While Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2, prohibits *employers* from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," before Title IX no such sweeping prohibition constrained the nation's public and private schools.  Title VI, 42 U.S.C. § 2000d, guarantees that "[n]o person in the United States shall, on the ground of race, color, or national origin," be subject to "discrimination under any program or activity receiving Federal financial assistance."  This ensured that federal funds, such as those going to public and private schools, were spent in accordance with the Equal Protection Clause's prohibition on racial discrimination, but it left sex discrimination untouched.

Nonetheless, Title VI was a model for Title IX.  Title VI was written with vital Fourteenth Amendment principles of equality in mind and was passed to "halt federal funding of entities that violate a prohibition of racial discrimination similar to that of the Constitution."  *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 284 (1978).  One year after *Reed v. Reed*, 404 U.S. 71 (1971), held that a state law that discriminated against women denied them the equal protection to which they were entitled under the Constitution, Congress passed Title IX, requiring public and private schools receiving federal aid to respect constitutional principles of sex

equality. As the Supreme Court has observed, "Title IX was patterned after Title

VI of the Civil Rights Act of 1964," *Cannon v. Univ. of Chi.*, 441 U.S. 677, 694

(1979), using language that "like that of the Equal Protection Clause" is "majestic

in its sweep," *Bakke*, 438 U.S. at 284, "to avoid the use of federal resources to

support discriminatory practices" and to "provide individual citizens effective

protection against those practices," *Cannon*, 441 U.S. at 704; *Gebser v. Lago Vista

Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998); *Jackson v. Birmingham Bd. of Educ.*,

544 U.S. 167, 175 (2005) ("Title IX is a broadly written general prohibition on

discrimination," which "covers a wide range of intentional unequal treatment; by

using such a broad term, Congress gave the statute a broad reach.").

Further, like Title VII, Title IX is "written in starkly broad terms," which

outlaw "discrimination against individuals and not merely between groups . . .

whenever sex is a but-for cause of the plaintiff's injuries." *Bostock*, 140 S. Ct. at

1753. It provides that "no person in the United States" may be denied "access to

educational benefits and opportunities on the basis of gender." *Davis v. Monroe

Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999); *Cannon*, 441 U.S. at 691-92 (noting

Title IX's "unmistakable focus on the benefited class" as opposed to operating as

"simply a ban on discriminatory conduct by recipients of federal funds"); *Elwell v.

Oklahoma ex rel. Bd. of Regents*, 693 F.3d 1303, 1311 (10th Cir. 2012) (Gorsuch,

J.) ("Title IX does not limit its coverage at all, outlawing discrimination against

any 'person,' broad language the Court has interpreted broadly." (citation omitted)).  Because of its focus on protecting all persons, Title IX's broad language applies to people of all genders, prohibiting all "official action denying rights or opportunities based on sex," *Virginia*, 518 U.S. at 531, by governmental and private recipients of federal aid.  In passing Title IX, as with Title VII and other federal civil rights statutes, "Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (quoting *L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978)).

The broad sweep of Title IX, extending to all persons, plainly prohibits discrimination against transgender students such as Jane Doe.  The Supreme Court's recent decision in *Bostock* effectively settles this.  There, the Court held that Title VII's prohibition on sex discrimination in employment forbids transgender discrimination.  "By discriminating against transgender persons, the employer unavoidably discriminates against persons with one sex identified at birth and another today." *Bostock*, 140 S. Ct. at 1746.  As the *Bostock* Court recognized, "discrimination based on . . . transgender status necessarily entails discrimination based on sex; the first cannot happen without the second." *Id.* at 1747.  In this respect, *Bostock* simply recognizes what this Court declared several years earlier: "By definition, a transgender individual does not conform to the sex-

7

based stereotypes of the sex that he or she was assigned at birth . . . 'sex discrimination includes discrimination against a transgender person for gender nonconformity.'" *Whitaker*, 858 F.3d at 1048 (quoting *Chavez v. Credit Nation Auto Sales, LLC*, 641 F. App'x 883, 884 (11th Cir. 2016) (unpub.)).

*Bostock*'s holding applies equally to Title IX, which contains a broad prohibition on sex discrimination in education that is virtually indistinguishable from the text the Supreme Court interpreted in *Bostock. See Franklin v. Gwinnett County Pub. Schs.,* 503 U.S. 60, 75 (1992) (holding that the "same rule" derived from Title VII precedent "should apply" under Title IX "when a teacher sexually harasses and abuses a student"). Indeed, as this Court has already recognized, "[b]oth Title VII . . . and Title IX . . . involve sex stereotypes and less favorable treatment because of the disfavored person's sex. *Bostock* thus provides useful guidance [in the Title IX context], even though the particular application of sex discrimination it addressed was different." *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023); *see also Grimm v. Gloucester County Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020) (holding that "*Bostock* . . . guides our evaluation of claims under Title IX"). Thus, under settled law, transgender students like Jane Doe may invoke the promise of equal educational opportunity that Title IX guarantees to all.

## II.     The School Board's Policy Constitutes Unlawful Discrimination Under Title IX of the Civil Rights Act.

The School Board's policy here discriminates against Jane Doe on the basis of sex in violation of Title IX.  The term "discrimination" covers "a wide range of intentional unequal treatment," *Jackson*, 544 U.S. at 175, that injures a person.  *See Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 59 (2006) ("No one doubts that the term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals."); *Bostock*, 140 S. Ct. at 1753 (quoting *Burlington*'s definition).

By denying Jane Doe the right to use the bathrooms used by other girls and forcing her to use either the boys' bathroom or one of two inconvenient, single-occupancy bathrooms, the School Board segregates her from "otherwise identical" students who were identified as "female at birth."  Put differently, the School Board's policy treats her differently than other students because she does not conform with sex stereotypes.  As this Court explained in *Whitaker*, "A policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX.  The School District's policy also subjects . . . a transgender student, to different rules, sanctions, and treatment than non-transgender students, in violation of Title IX."  *Whitaker*, 858 F.3d at 1049-50; *see also Bostock,* 140 S. Ct. at 1741.

By discriminating against Jane Doe in this way, the School Board's policy robs her of her dignity and stigmatizes her. *See, e.g.*, *Grimm*, 972 F.3d at 617-18 ("The stigma of being forced to use a separate restroom is likewise sufficient to constitute harm under Title IX, as it 'invite[s] more scrutiny and attention' from other students, 'very publicly brand[ing] all transgender students with a scarlet 'T'.'" (quoting *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 530 (3d Cir. 2018))); *id.* at 621 (Wynn, J., concurring) ("[T]he Board's policy produces a vicious and ineradicable stigma. The result is to deeply and indelibly scar the most vulnerable among us—children who simply wish to be treated as equals at one of the most fraught developmental moments in their lives—by labeling them as unfit for equal participation in our society."); *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016) (noting the distress that preventing transgender student from using bathroom consistent with her gender identity would cause).

Moreover, the harms caused by policies like the one put in place by the School Board here can be quite tangible as well. In *Martinsville*, this Court was faced with the medical and academic consequences that can result when transgender students are prohibited from using bathrooms that match their gender identity. *See Martinsville*, 75 F.4th at 765-66. There, as the record reflected, the students avoided using the bathroom altogether, which exacerbated pre-existing medical conditions and is itself medically dangerous. *Id.* Some students restricted

their water intake to try to reduce their need to go to the bathroom. *Id.* at 767.

When students did use the gender-neutral bathroom, they risked missing class time

because it was so far from their lessons. *Id* at 765-66. Students were also

concerned that having to use bathrooms that did not match their gender identity

would reveal to other students that they were transgender. For these reasons and

because of the stigma and isolation more generally, students "dreaded going to

school," and their grades dropped as a result. *Id.*

Insisting that its policy is lawful, the School Board asserts that in Title IX

and its implementing regulations the word "sex" was "meant to differentiate males

from females on a physical and anatomical basis as used throughout the statute."

Appellants Br. 19 (citing 20 U.S.C. § 1686; 34 C.F.R. § 106.33). Accordingly, the

Board argues, schools are authorized to segregate bathrooms strictly based on

genitalia. *Id.* at 19, 27. That is not correct. First, this reading is at odds with the

plain text of the regulations. As this Court has already noted, the "term

'biological'" is "absent" from those regulations. *Whitaker*, 858 F.3d at 1047.

Further, while the School Board accurately notes that Title IX allows an "exception

for sex-based distinctions in terms of living, restroom, and shower facilities,"

Appellants Br. 19, its brief mischaracterizes Congress's justification for this as a

requirement that sex-based distinctions be based on *anatomy*. *See id.* While

Senator Bayh noted there might be an exception in "classes for pregnant girls,"

"sports facilities," and "other instances where personal privacy must be preserved," nothing in this statement suggests that bathrooms must be segregated by genitalia. *See* 118 Cong. Rec. 5807 (1972) (statement of Sen. Bayh).

As this Court reaffirmed in *Martinsville*, Title IX's regulations permit school authorities to maintain separate bathrooms for boys and girls, but they do not give school authorities the right to discriminate against transgender students by segregating transgender girls like Jane Doe from their peers and stigmatizing them. *Martinsville*, 75 F.4th at 770 ("Though [Title IX] certainly permits the maintenance of sex-segregated facilities, we stress again that neither the plaintiff in *Whitaker* nor the plaintiffs in these cases have any quarrel with that rule. The question is different: who counts as a 'boy' for the boys' rooms, and who counts as a 'girl' for the girls' rooms—essentially, how do we sort by gender? The statute says nothing on this topic."). Nothing in Title IX or its implementing regulations authorizes transgender students to be shunted away from their peers and forced to choose between a bathroom at odds with their gender identity or isolated restroom facilities designed for them and them alone. *See Grimm*, 972 F.3d at 618 ("[T]he implementing regulation cannot override the statutory prohibition against *discrimination* on the basis of sex. All it suggests is that the act of creating sex-separated restrooms in and of itself is not discriminatory—not that, in applying

bathroom policies to students like Grimm, the Board may rely on its own discriminatory notions of what 'sex' means.").

In short, both Supreme Court precedent and this Court's precedents are clear: schools that accept federal financial assistance must comport with Title IX's sweeping guarantee of equality that protects all persons from sex-based discrimination. The question here, as in *Whitaker* and *Martinsville*, is whether the School Board's actions run afoul of Title IX's prohibition on discrimination.[2] The

---

[2] The School Board argues that this Court should not follow *Whitaker* and *Martinsville* because *Whitaker* "found justification for its Title IX holding in Eleventh Circuit case law involving Title VII claims," and "[s]ince *Whitaker* was decided . . . the Eleventh Circuit has articulated the correct standard against which to judge Title IX claims involving analogous facts." Appellants Br. 18 (citing *Adams v. Sch. Bd. of St. Johns County*, 57 F.4th 791 (11th Cir. 2022)). But this Court does not "lightly overturn circuit precedent," *United States v. Snyder*, 71 F.4th 555, 580 (7th Cir. 2017), and instead "'give[s] considerable weight to prior decisions of this court unless and until they have been overruled or undermined by the decisions of a higher court, or other supervening developments, such as a statutory overruling,'" *Santos v. United States*, 461 F.3d 886, 891 (7th Cir. 2006) (quoting *Haas v. Abrahamson*, 910 F.2d 384, 393 (7th Cir.1990)); *see also Martinsville*, 75 F.4th 760, 764 (7th Cir. 2023) (rejecting a request to revisit the Court's holding in *Whitaker*, noting that "[w]e assume that at some point the Supreme Court will step in with more guidance than it has furnished so far. Until then, we will stay the course and follow *Whitaker*").

And the Eleventh Circuit's decision in *Adams* is not persuasive in any event. In holding that the bathroom policy at issue there did not violate Title IX, that court relied on the fact that "Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for differentiating between the sexes when it comes to separate living and bathroom facilities." *Adams*, 57 F.4th at 811; *see id.* at 858 (Jill Pryor, J., dissenting) ("The majority opinion's analysis of Adams's Title IX claim relies on statutory and regulatory carveouts, which, it says, foreclose the claim."). But as Judge Pryor explained in dissent, "[A]ll the carveouts 'suggest[] is that the act of creating sex-separated [facilities] in and of itself is not discriminatory.'"

School Board's policy, which denies transgender students the use of the restrooms used by other students and stigmatizes them based on fear, prejudice, and sex stereotypes, cannot be squared with the promise of gender equality that Title IX promises to all students, including those, like Jane Doe, who are transgender.

## **CONCLUSION**

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

/s/ Elizabeth B. Wydra
Elizabeth B. Wydra
Brianne J. Gorod
David H. Gans
Jess Zalph*
CONSTITUTIONAL
ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
Tel.: (202) 296-6889
elizabeth@theusconstitution.org

* Not admitted in D.C.; supervised
by principals of the firm

---

*Adams*, 57 F. 4th at 858 (Jill Pryor, J., dissenting) (quoting *Grimm*, 972 F.3d at 618). They do not, she further explained, address how an institution decides which facilities an individual should use, or "permit an educational institution to 'rely on its own *discriminatory* notions of what "sex" means.'" *Id.* at 858-59 (quoting *Grimm*; emphasis added in *Adams*); *see also supra* at 12-13. Indeed, this Court has already rightly rejected the argument that the carveouts support policies like the one at issue here. *See supra* at 12-13.

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), Fed. R. App. P. 29(d), and Circuit Rule 29 because it contains 3,444 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

I further certify that the attached brief or *amicus curiae* complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the type-style requirements of Fed. R. App. P. 32(a)(6), and Circuit Rule 32(b) because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 26th day of October, 2023.

/s/ Elizabeth B. Wydra
Elizabeth B. Wydra
*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on October 26, 2023.

I certify that all parties in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 26th day of October, 2023.

/s/ Elizabeth B. Wydra
Elizabeth B. Wydra